WESLEY KOTHMAN ET AL V. L. E. BOLEY ET AL

No. A-6373. Decided December 11, 1957.
Rehearing overruled January 15, 1958. ——
(308 S.W. 2d Series 1.)

*Hardwicke, Haddaway & Alex Pope, Jr.,* and *Robert E. Hardwicke, Jr.,* all of Fort Worth, for petitioners.

The Court of Civil Appeals erred in holding that lessees did not comply with the drilling obligation of the leases, and in ordering a forfeiture of the leases, when the undisputed evidence showed that they commenced a well and drilled it from the surface through rock, cement and other material to a depth of about 3,000 feet and from that point drilled an entirely new hole to a depth of 3,400 feet within the time specified. Terry v. Texas Company, 228 S.W. 1019.

*Grindstaff, Zellers & Hutcheson* and *Austin E. Zellers,* all of Weatherford, for respondents.

Cited Childress v. Siler, 272 S.W. 2d 417.

MR. JUSTICE WALKER delivered the opinion of the Court.

L. E. Boley et al., respondents, brought this suit against Wesley Kothman et al., petitioners, to cancel five oil and gas leases covering land in Jack County on the ground that petitioners had not complied with the following lease provision:

"Unless a well is commenced within sixty (60) days from this date the lease shall terminate, and when commenced, said well to be drilled to the Ellenburger lime unless oil and/or gas is encountered at a lesser depth."

The five leases, which are dated August 3, 1954, were executed by respondents as lessors to Kothman as lessee, and the latter assigned interests therein to the other petitioners. Each lease covers a separate tract of land. The provision quoted above is contained in the instrument which covers a tract of 164 acres designated as Block 22, Henderson County School Land Survey. All of the other leases stipulate that "unless a well is commenced within sixty days from this date on Block 22 then this lease shall terminate as to both parties."

The only issues submitted or requested relate to the question of whether respondents are estopped to assert that the leases have terminated under the provisions mentioned above.

These were answered by the jury favorably to respondents. There was no exception to the charge. On the basis of the jury verdict and the undisputed evidence, the district court entered judgment cancelling the five leases. A majority of the Court of Civil Appeals concluded that petitioners had not commenced a well on Block 22 within the sixty-day period and affirmed the judgment of the trial court. 301 S.W. 2d 235. It is our opinion that the leases are in full force and effect.

There is no dispute as to any of the material facts. Three wells had previously been drilled on Block 22 and all were abandoned as dry holes several years before the leases now in controversy were executed. These old wells are referred to by the parties as the north, south and middle wells. The condition of th south well is not material and will not be described. When the north and middle wells were abandoned, the former operators plugged the bottom of each with concrete and filled the remainder of the holes to the surface with mud, rocks and other materials. About ninety feet of surface pipe was left in the north well, but there was none in the middle well. No casing was set in either well, and their sides caved in at various depths. This was the condition of the two old wells when respondents leased to Kothman.

On August 9, 1954, petitioners moved a small rig to the surface location of the south well. Four days later the rig was moved to the site of the north well but was dismissed after reaching a depth of about 160 feet. Petitioners then had Marine Production Company move a large rotary rig to the surface location of the north well, and this rig began operating on August 17th. After reaching 3,000 feet, the original depth of the old north well, it began cutting an entirely new hole and drilled an additional 400 feet to a total depth of 3,400 feet. Casing was set and perforated at 3,000 feet, and after swabbing and other operations a well capable of producing gas in commercial quantities was completed on September 16th. This was more than two weeks before the end of the 60-day period.

The large rig was then moved to the site of the old middle well, which had previously been drilled as a five-inch hole to a depth of over 6,000 feet. Petitioners there cut a five and one-half inch hole to a depth of 3,100 feet and completed a second well capable of producing gas in paying quantities. The opening of the hole for this second well was begun before, but the well apparently was completed after, the end of the 60-day period.

No contention is made that the work done by petitioners was not delinquently prosecuted. Although they did not reach the Ellenburger lime, the discovery of gas in paying quantities at a lesser depth relieved them of any obligation to do so. The narrow question then is whether petitioners commenced and drilled a well within the meaning of the leases.

■ Respondents argue that petitioners did nothing more than redrill or rework the two old wells. They say that a well can be commenced only by being drilled from the surface at a point where a hole has never been opened before, and that a well is drilled only when the natural formations are penetrated for the first time. This would mean that the leases might have been kept alive by drilling at a point one foot away from, but not by reopening, any of the old wells. We cannot believe that the parties intended to draw any such line.

When the leases were executed, the principal objectives of the parties were the discovery and production of oil, gas or other minerals. Their primary purpose in adding the provision in question was to place the lessee under some compulsion to make an early start on the work designed to accomplish these aims. The lessors also wanted a test well drilled to the Ellenburger lime unless minerals were discovered at a lesser depth, and it was accordingly provided that the lessee would make such a test if he began a well within the stipulated time.

■ A well is a shaft or hole bored or sunk in the earth through which the presence of minerals may be detected and their production obtained. When petitioners began work on Block 22, there was no well at either the north or middle location. The natural formations had previously been penetrated at each place, and petitioners were able to do their work more easily and quickly for that reason. Before minerals could be discovered or produced, however, it was necessary to open a hole where none existed. This petitioners did by boring from the surface through mud, cavings, rock, cement and other materials to a depth where gas was discovered in commercial quantities.

■ Respondents do not contend that the leases are ambiguous in any respect and have not sought to reform the same. In construing the instruments, therefore, we cannot consider the conversations between the parties either before or after the leases were executed. Respondents call attention to the recitals in applications filed with the Railroad Commission that petitioners

intended to "re-drill" and to the testimony that the operations conducted on the premises would ordinarily be called reworking or redrilling. When the purposes to be accomplished by the leases are considered, however, it seems clear to us that the parties did not intend to differentiate between redrilling and drilling. As pointed out above, the only question is whether petitioners commenced and drilled a well within the meaning of the leases, and we think they did. See Durbin v. Osborne, 292 Ky. 464, 166 S.W. 2d 841. We hold, therefore, that there was no failure to comply with the lease provisions mentioned above. This brings us to a consideration of the order to be entered in the case.

■ Paragraph 2 of each lease provides that the same shall be for a term of one year and as long thereafter as oil, gas or other mineral is produced from the land thereunder. Provision is made in the succeeding paragraph for the payment of shut-in gas royalties of $50 per well per year, and paragraph 4 is a conventional "unless" drilling clause with the spaces for the name and address of the bank and the amount of the rental left blank.

Respondents contended in the Court of Civil Appeals that the four secondary leases had terminated because their primary terms had ended and no minerals had been produced from the land covered thereby. This contention would doubtless be sound in the absence of the circumstances hereafter mentioned. By letter dated December 1, 1954, respondents through L. E. Boley notified petitioners that the leases had terminated. In spite of this letter petitioners on August 1 and August 3, 1955, tendered respondents the shut-in royalty due under the lease covering Block 22. This suit was filed October 28, 1955. Prior to receipt of the letter petitioners were attempting to secure a connection for the two gas wells and were making preparations to continue development of the leases. These efforts were discontinued when the letter was rceived, which was over eight months before the end of the primary term.

Lessors who thus wrongfully repudiate the lessees' title by unqualified notice that the leases are forfeited or have terminated cannot complain if the latter suspend operations under the contract pending a determination of the controversy and will not be allowed to profit by their own wrong. See Adams v. Cannan, Texas Civ. App., 252 S.W. 2d 948 (wr. ref.) ; Wisdom v. Minchen, Texas Civ. App., 154 S.W. 2d 330 (wr. ref. w.m.) ; Wheelock v. Batte, Texas Civ. App., 225 S.W. 591 (wr. ref. n.r.e.) ; Morgan v. Houston Oil Co., Texas Civ. App. 83 S.W.

2d 312 (no writ) ; and Shell Oil Co. v. Goodroe, Texas Civ. App., 197 S.W. 2d 395, (wr. ref. n.r.e.).

It is our opinion, therefore, that the judgments of the courts below should be reversed and the cause remanded to the trial court with instructions to enter judgment: (1) requiring petitioners to pay respondents on or before thirty days after the date of the judgment all accrued and unpaid shut-in gas royalties under the lease on Block 22, and providing that in the event petitioners fail to comply with this portion of the judgment such lease shall terminate; (2) denying respondents any other relief; (3) establishing petitioners' ownership of the five leases and that the same are in full force and effect and, subject to (1) above, removing any cloud from petitioners' title to the leasehold estates thereunder; and (4) that each of the four secondary leases shall, subject to all of its provisions except Paragraphs 2 and 4, be and remain in full force and effect for a term of eight months from the date of the judgment and as long thereafter as oil, gas or other mineral is produced from the land thereunder, and that the end of such period of eight months shall be deemed the end of the primary term for all purposes. It is so ordered.

Opinion delivered December 11, 1957

Rehearing overruled January 15, 1958.