**ATLANTIC RICHFIELD COMPANY et al.,**
**Appellants,**

v.

**W. O. HILTON et al., Appellees.**

**No. 402.**

Court of Civil Appeals of Texas.

Tyler.

Jan. 30, 1969.

Rehearings Denied Feb. 20, 1969.

Ramey, Brelsford, Flock, Devereux & Hutchins, Tom B. Ramey, Jr., and Frank L. McClendon, Tyler, for appellant, Atlantic Richfield Co., and others.

Wilson, Miller, Spivey & Steger, Marshall Spivey, Tyler, for appellant, Centenary College of Shreveport.

Kliewer & Hood, Edward Kliewer, Jr., Dallas, for appellees.

DUNAGAN, Chief Justice.

This suit involves the question of whether an oil, gas and mineral lease executed by appellees, the Hiltons and McCoys, owners of the leasing privilege, to the predecessor in title of appellant, Atlantic, had terminated.

Appellees, W. O. Hilton and wife, Malvirin Hilton and L. A. McCoy and wife, Ila Mae McCoy, filed suit in November, 1961, against Atlantic Refining Company, now Atlantic Richfield Company, in the District Court of Henderson County, Texas, to remove as a cloud on title to an 82.713 acre tract, a part of a Unit Declaration for 160 acre oil unit filed by appellant, Atlantic, under an oil and gas lease executed by appellees, the Hiltons and McCoys, and which lease appellees claimed to be invalid because of a lack of sufficient description of land. Atlantic filed a counter claim against appellees, the Hiltons and McCoys, in the nature of a trespass to try title action. The case was removed from State Court to the U. S. District Court in Tyler on Atlantic's verified petition and bond. The appellees herein filed a motion in Federal Court to remand the cause to the District Court of Henderson County for the purpose of bringing in certain royalty owners who are alleged to be necessary and/or indispensable parties. The Federal District Court overruled the motion to remand. The Court then proceeded to hear the case on its merits without the aid of a jury. Upon considering the pleadings, pre-trial stipulations and pre-trial order, and the evidence, the Court proceeded to render judgment against appellees on their cause of action and rendered judgment for Atlantic on its counter claim. The United States Court of Appeals for the Fifth Circuit reversed the trial court's order overruling the motion to remand and ordered the case remanded to the State Court for the joinder of indispensable parties, and thereby effected a reversal of the judgment on the merits in favor of Atlantic. Hilton v. Atlantic Refining Company, 327 F.2d 217. On April 20th, 1967, after the cause had been remanded to the Henderson County District Court, the appellees herein (plaintiffs in the court below) joined by Willis D. Moore, as a plaintiff, amended their pleadings suing for title and possession of said tract alleging for the first time the lease executed by appellees, the Hiltons and McCoys, did cover the 82.713 acre tract, but asserting that appellant, Atlantic, exceeded the pooling powers in said lease, and there being no producing well on said tract when the primary term expired, that said lease terminated. Appellees filed motion for summary judgment based on the holding in Jones v. Killingsworth, 403 S.W.2d 325 (Tex.Sup.1965). Appellants also filed motion for summary judgment. The trial court granted appellees' motion for summary judgment and denied appellants' motion for summary judgment, resulting in this appeal.

On August 5, 1951, appellees, the Hiltons and McCoys, executed a 7/8ths oil and gas lease for a primary term of ten years referred to as the Hilton-Atlantic Lease cov-

ering a called 80-acre tract in the Alfred Benge Survey, Henderson County, Texas, re-surveyed to be 82.713 acres which was assigned to appellant Atlantic. Delay rentals were paid to cover the privilege of deferring commencement of drilling operations to the end of the primary term on August 5, 1961. The Hilton Lease provided for pooling for oil in units not substantially to exceed 40 acres in area with the provision "that should governmental authority having jurisdiction prescribe or permit the creation of larger units than those specified, units thereafter created may conform substantially in size with those prescribed by governmental regulations."

Adjoining said Hilton and McCoy Tract on the West is the J. W. Melton Tract. Also, on August 5, 1951, appellants, J. W. Melton and wife, Virgie Melton, executed an oil and gas lease covering their tract, re-surveyed to be 83.815 acres, for a primary term of ten years, which was also assigned to appellant Atlantic. Delay rentals were also paid to the end of the primary term under this lease and same contained similar pooling provisions as in the Hilton et al Lease assigned to Atlantic.

The Railroad Commission on March 14, 1961, effective February 13, 1961, promulgated an order, which included the following:

"No proration unit shall consist of more than 80 acres except as hereinafter provided * * *

"Provided, however, that operators may elect to assign tolerance of not more than eighty (80) acres of additional unassigned lease acreage to a well on an eighty (80) acre unit and shall in such event receive allowable credit for not more than one hundred sixty (160) acres."

On June 12, 1961, the Railroad Commission amended its first order and ordered for the Fairway (James Lime) Field effective July 1, 1961, proration units of 80 acres plus 80 acres tolerance for each well and for filing of proration plats showing acreage assigned each well by July 1, 1961.

On June 30, 1961, Atlantic executed and filed for record a Declaration of Unit reciting itself to be the owner of said J. W. Melton and wife Lease and W. O. Hilton et al Lease, and reciting said leases granted the right and power to pool the lands covered by same with other land, leases or mineral interests "to form units of the size permitted or prescribed by the Railroad Commission of Texas"; and further reciting that by the order of the Railroad Commission "adopted rules providing for 160 acre spacing for oil", and that for the purpose of promoting conservation and complying with said spacing rules, Atlantic desired to declare a unit for the production of oil from the James Lime Formation, and in the exercise of its right and power declared said leases pooled so as to form a unit consisting of the North 80 acres of said W. O. Hilton et al Lease and the North 80 acres of the J. W. Melton and wife Lease.

Appellant, Atlantic, in either March or April, 1961, in preparing for making a drilling location on the Hilton Tract and as a result of a title requirement, sought from appellees, the Hiltons and McCoys as lessors, the execution of a lease description amendment to correct an erroneous call in the lease description of the land calling for the beginning corner to be at the Northeast corner of the Hilton Tract and to go East, instead of for the beginning corner to be at the Northwest corner of the Hilton Tract. Appellees, the Hiltons and McCoys, were requested a number of times to execute the lease description amendment and to all these requests refused to do so. Atlantic then moved its drilling location to the adjoining Melton Tract and commenced drilling the well on April 30, 1961, completing same on June 8, 1961, in the James Lime Formation, with actual production of oil commencing on June 25, 1961, which has continued to date. No well has been drilled in the search of oil or gas on the Hilton and McCoy Tract and consequently

no production of oil, gas or other minerals has been obtained therefrom.

The Hiltons and McCoys were presented division orders which they declined to execute.

Appellees, the Hiltons and McCoys, then on June 1, 1961, executed two top leases covering the 82.713 acre tract in favor of Willis D. Moore, which were for primary terms of ten (10) years. These leases were filed for record on December 28, 1966.

While this case was pending in the Federal Court, a pre-trial order, including written stipulations of the parties, was entered and filed with the papers as part of the record made in open court in the case.

The stipulations in said pre-trial order contained appellees' stipulation that the issues involved in the suit related to the sufficiency of the land description in the W. O. Hilton et al Lease.

Upon remand to the State Court the appellees remained the same, appellant was the same, and appellees' lawsuit was the same until the second amended petition was filed by appellees on April 20, 1967, when the other party defendants (appellants) were brought in.

Appellants contend that said stipulations are binding contracts on the parties and are still in full force and effect and that the appellees should not be permitted to assert Atlantic exceeded its authority to pool or that said tracts were not pooled and further that appellees are not entitled to recover in this court on an assertion directly opposite that upon which they recovered judgment in the Federal Court.

Appellants' contentions under their first three points of error involve the effect of appellees' stipulations contained in the pre-trial order entered in this case, at a prior time, by the Federal District Court.

Appellees stipulated in Federal Court that the basis of their recovery was the insufficiency of the description of the land. Thus, the question before the Federal Court was: Was the lease invalid for lack of a proper description? No contested fact issues were involved. Therefore, the issue before the Federal Court involved only a question of law.

It seems to be a well established rule of law that stipulations of counsel with respect to the construction and legal effect of unambiguous contracts are not binding on either the court or the parties. Swift & Company v. Hocking Valley Railway Company, 243 U.S. 281, 37 S.Ct. 287, 61 L.Ed. 722 (1917); New Amsterdam Casualty Company v. Waller (C.A. 4th) 323 F.2d 20, cert. den., 376 U.S. 963, 84 S.Ct. 1124, 11 L.Ed.2d 981 (1963); Smith, Kirkpatrick & Co. v. Continental Autos, Ltd. (U.S.D.C.) 184 F.Supp. 764 (1960); American Chemical Paint Co. v. Dow Chemical Co. (C.A. 6th) 164 F.2d 208 (1947); Reynolds v. McMan Oil & Gas Co., 11 S.W.2d 778 (Tex. Com.App., 1928); Travelers' Indemnity Co. v. DeWitt, 207 S.W.2d 641 (Tex.Civ.App., 1948, Galveston, n. w. h.); Bishop v. Sanford, 35 S.W.2d 800 (Tex.Civ.App., Amarillo, 1931, writ dism.); 53 T.J.2d, page 315, Sec. 3; see also 92 A.L.R. 663, 671.

There was no claim that the lease was ambiguous. Under the above cited authorities, since the stipulated issues before the Federal Court involved only a question of law, appellees were not barred or foreclosed from thereafter amending their pleadings and proving that, as a matter of law, the Atlantic-Hilton Lease had terminated because of improper exercise of the pooling privilege under the doctrine of Jones v. Killingsworth, supra. These points are overruled.

The appellants next contend that "Appellees during the primary term of the Hilton-Atlantic lease wrongfully repudiated Atlantic's title under said lease and thereby suspended the running of the primary term pending the determination of the controversy." This contention is also overruled.

It is appellants' position that one or more of three occurrences constituted a "repudi-

ation" of the lease in question: (1) Hilton's and McCoy's refusal to execute a lease amendment; (2) the execution by Hilton and McCoy of two top leases to Mr. Moore; or (3) the statement made by Mr. Moore in a telephone conversation with Atlantic's Mr. Biard in the first week of July, 1961.

It is undisputed that Atlantic's employee, Paul Loman, was the only Atlantic representative who had direct contact with the lessors about the lease amendment. Mr. Loman, in his affidavit, offered by Atlantic in support of its motion for summary judgment, states:

> " * * * I think it was about March 1, 1961, that I first went to see Mr. Hilton about executing a lease description amendment for the purpose of correcting the description of the land in the above lease. I know that I went back several times to see Mr. Hilton, and that, as I remember some time in May, 1961, Mr. L. A. McCoy who was then living in Louisiana made a trip back to East Texas, and that I also went to see him about executing the lease description amendment and also talked to him by long distance telephone. I know that Mr. Hilton and Mr. McCoy both refused to execute the lease description amendment, and that they both stated on one or more of the times mentioned above that Atlantic's lease was either good or it was not any good, and that if it was good then Atlantic did not need anything signed, and that they would not sign it. I also remember that on one of the occasions above, that one of the wives stated that if the lease was not any good then they, the Hiltons and McCoys, owned the lease instead of Atlantic. To the best of my remembrance this last occasion was in the last part of May, 1961 * * *."

Mr. Hilton in his deposition offered by appellees testified as follows in response to questions propounded by Mr. McClendon:

> "Q Alright. Well, what did you tell him about whatever the paper was that he wanted you to sign?

> "A Well, I tried to get him to let me have it and take it to my attorney.

> "Q And what did he say?

> "A He wouldn't do it.

> "Q Alright.

> "A He put it back in his briefcase and tore out, back to town."

Mr. McCoy in his deposition which was also offered by appellees testified as follows in response to questions propounded by Mr. McClendon:

> "Q Well, what caused you to come to the conclusion that it was an invalid lease?

> "A When Atlantic's representatives went to trying to get in touch with me, to get me to sign some papers.

> "Q Did he talk to you about it?

> "A Yes, sir. He did.

>     *    *    *    *    *    *

> "Q Alright. Well, if you will, just state what was said in the conversation.

> "A Well, he came to me with these * * * he first brought 'em to Mr. Hilton and then he came over there. I was up from New Orleans on a visit and he met me over there at Mr. Hilton's place and tried to get me to sign those papers. And I told him no, that we had already signed some papers for the lease on the land. * * *

>     *    *    *    *    *    *

> "Q And did you tell him that you wouldn't sign them because the lease wasn't any good because it didn't describe the land?

> "A No. That wasn't the reason why I wouldn't sign 'em. I just didn't think it was necessary to sign another paper on that.

*   *   *   *   *   *

"Q Alright. What was said then?

"A Well, he said he would send me the papers to be signed again and he tried to get me to sign 'em again and I told him I wouldn't sign 'em. He asked me if I wanted him to fly down there and I told him no, that wouldn't be necessary.

"Q Alright. Well, did he ever come back again or talk to you any more, after that?

"A Not that I know of. No, sir."

The affidavit of Atlantic's employee, Jack Biard, of September 20, 1967, shows that the only contact he had with any of appellees was through his telephone call to Mr. Moore, attorney for the Hiltons and McCoys, in the first week of July, 1961.

Biard stated in his affidavit that in a telephone conversation with Willis Moore, attorney for the Hiltons and McCoys, in the first week of July, 1961, Mr. Moore advised him that the Hiltons and McCoys would not execute the lease description amendment because they (Hiltons and Mc-Coys) had *decided that Atlantic did not own an oil and gas lease covering the Hilton, et al 80 acre, more or less, Tract in the Alfred Benge Survey* because of the claimed defect in the description of the land.

A. A. Allen, by affidavit, also an employee of Atlantic, stated that a letter dated September 25, 1961, from Willis Moore was received by him on or about September 26, 1961, the pertinent parts of which read:

"As I told Mr. B*eird* of your Tyler office during the first part of July, 1961, Mr. and Mrs. Hilton *are of the opinion* that your company does not hold any oil and gas lease covering the 80 acres that they own on the Alfred Benge League in Henderson County, Texas.

"You are therefore *requested* to amend your Declaration of Unit recorded in Vol. 498, page 389 of the Deed Records of Henderson County, Texas, so as to delete the 80 acres of land belonging to them which 80 acres of land is included within the field notes contained in such Declaration of Unit.

"Your immediate attention to this matter will be appreciated as Mr. and Mrs. Hilton and Mr. and Mrs. McCoy have recently had several opportunities to lease their land and feel that they are being damaged substantially so long as their title is clouded by your Declaration of Unit." (Emphasis ours).

■ It is clear under the controlling authorities hereinafter cited that, as a matter of law, under the facts here presented the refusal of the Hiltons and McCoys to execute the lease amendment was not a "repudiation" of the lease. The lessors' position was simply that Atlantic either had a valid lease or it did not.

■ Under either version of the conversation between Moore and Biard, as related by them, it is clear that Moore did not tell Biard that Atlantic did not have a lease. Moore was only informing Biard that the Hiltons and McCoys were "of the opinion" or "had decided" that Atlantic did not have a lease. The statement by Moore to Biard was not a statement of Moore's legal opinion on the subject and did not constitute a "repudiation" of the lease by Moore. It is equally clear that Moore's statement did not constitute a repudiation of the lease by the Hiltons and McCoys.

Moreover, Atlantic failed to establish that as a result of any of the grounds alleged to constitute repudiation of the lease, it suspended operations under the Hilton-Atlantic Lease or that it acted thereon to its prejudice. As a matter of fact, this record reveals that Atlantic, prior to and at the time of the expiration of the primary term of the lease on August 5, 1961, was of the opinion that it was continuing operations on the lease by virtue of combining the 80 acres of the Hilton and McCoy

Lease with the 80 acres of the Melton Lease upon which tract the producing well was located establishing the 160 acre Atlantic-Melton Unit.

■ The Supreme Court in the case of Kothmann v. Boley, 158 Tex. 56, 308 S.W. 2d 1 (1957) states the rule as follows:

"Lessors who thus wrongfully repudiate the lessees' title *by unqualified notice* that the leases are forfeited or have terminated cannot complain if the latter *suspends operations* under the contract pending a determination of the controversy and will not be allowed to profit by their own wrong. * * *" (Emphasis ours).

See Sunray DX Oil Company v. Texaco, Inc., 417 S.W.2d 424 (Tex.Civ.App., El Paso, 1967, writ ref., n. r. e.).

■ In Adams v. Cannan, 253 S.W.2d 948 (Tex.Civ.App., San Antonio, 1952, writ ref.) which involved an alleged repudiation of an oil and gas lease, the court stated:

"The rule relied upon by appellees is one of equitable estoppel, and the generally accepted statement thereof is that made by the late Chief Justice Smith of this Court in Morgan v. Houston Oil Co., Tex.Civ.App., 84 S.W.2d 312, 314, viz.:

" 'It is well settled that when a lessor determines to forfeit or cancel an oil and gas lease, and *puts the lessee on notice thereof, he cannot complain if the latter suspends operations under the contract,* pending the determination of the asserted right of the lessor to forfeit or cancel.' " (Emphasis ours).

This rule has lately been restated by the Supreme Court in Concord Oil Co. v. Alco Oil And Gas Corp., 387 S.W.2d 635 (1965).

In the case of Steeple Oil & Gas Corp. v. Amend, 337 S.W.2d 809 (Tex.Civ.App., Amarillo, 1960, writ ref., n. r. e.) the court

was dealing with a similar situation wherein the lessor by letter had requested the owner of the oil and gas lease to give him a release as to the oil rights under his property because the owners of the oil and gas lease had not made any effort to exercise their rights to develop the properties covered by said lease. In disposing of this question, the court said:

"We do not believe the tender of such letters are such as to 'wrongfully repudiate the lessee's title by unqualified notice that the leases are forfeited or have terminated' within the holding of our Supreme Court in Kothmann v. Boley, 158 Tex. 56, 308 S.W.2d 1. To the contrary we believe the letters in the instant case are more comparable to those of similar import in Adams v. Cannan, Tex. Civ.App., 253 S.W.2d 948, 951 (writ refused). In that case Justice Norvell said:

" 'We do not regard the letter received by appellees on June 27, 1950, as presenting a clear, unequivocal challenge to lessee's title which is an essential basis of the doctrine relied upon. Although a release of the oil and gas lease was requested and there was some evidence that Adams had considered leasing the property to the Texas Company, should he be successful in securing the release, the letter itself does not purport to be a firm declaration of a position or contention that Adams held title to the premises involved to the exclusion of all rights of the appellees.' "

■ Thus, it is well settled that a letter written by the lessor or his counsel addressed to the owner of the lease relative to apparent termination of the lease, and a lessor's request that a release of the lease be executed and returned as submitted, does not constitute such a clear and unequivocal challenge to the lessee's title as will excuse the suspension of operations by the owner of the lease. Adams v. Cannan, supra; 42 Tex.Jur.2d 539, Sec. 239.

■ "In order for an estoppel to exist, it devolves upon the party seeking the advantage thereof to establish that he has been misled to his injury." Concord Oil Co. v. Alco Oil And Gas Corp., 387 S.W.2d 635 (Tex.Sup.1965); Fitch v. Lomax, 16 S.W.2d 530, 66 A.L.R. 758 (Tex.Com.App.) 1929. This the appellants have failed to do. In its Third Amended Original Answer, Atlantic Richfield Company makes the following judicial admissions:

" * * * and believing that Plaintiffs' claim, as to the lease being invalid for lack of sufficient description, to be without merit, this Defendant improved and operated the property and paid royalty to Plaintiffs' grantees for a period of over five (5) years before Plaintiffs filed their Second Amended Petition * * *.

* * * * * *

" * * * this Defendant now has, and has had and held peaceable, continuous, notorious and adverse possession of the oil, gas and other minerals in place under said land under the terms and provisions of said Lease and Declaration of Unit; and that this Defendant has been continously producing oil and gas therefrom, * * *."

■ These judicial admissions establish that the alleged "repudiation" was never relied on, and no operation was ever suspended during the primary term of the lease here in question by reason thereof.

We think it is apparent from a reading of the record in this case that neither Atlantic nor the appellees were aware there was any question about the legality of the Atlantic-Melton 160 acre unit until the Supreme Court delivered its decision in the case of Jones v. Killingsworth, 403 S.W.2d 325 (1965). It is also apparent that up to that time, Atlantic was not aware that in attempting to establish the Atlantic-Melton Unit, it had exceeded the pooling powers granted by the provisions of said lease.

■ It seems that when the lessor wrongfully repudiates an oil and gas lease, and puts the lessee on notice thereof, the benefits that inure to the owner of the lease as a result thereof is the right or privilege to suspend operations under the lease contract pending a determination of the controversy. As shown by its pleadings above set out, Atlantic contends that it continued to operate upon the Hilton and McCoy property throughout the primary term of the lease.

Accordingly, we hold that the refusal of the Hiltons and McCoys to execute the amended lease tendered to them by Atlantic or the statement of Mr. Moore, the Hilton's and McCoy's attorney, did not present a clear, unequivocal challenge to lessee's title.

■ In order to rely upon the top leases executed by the Hiltons and McCoys to their attorney, Mr. Moore, as a "repudiation" creating an estoppel, appellants had the affirmative burden of establishing that they had actual notice of such leases and that, in reliance thereon, operations were suspended under the Atlantic Lease. Petroleum Anchor Equipment, Inc. v. Tyra, 419 S.W.2d 829 (S.Ct.1967).

These top leases, which were executed on June 1, 1961, were not recorded until December, 1966, and appellants admit that they had no notice or knowledge of them prior to April 20, 1967, at a time long subsequent to the expiration date of the primary term of the Hilton and McCoy Lease assigned to Atlantic. There could not have been a suspension of operations during the primary term of the lease by reason of the top leases because appellants had no notice or knowledge of these leases during that period.

■ Under all the authorities involving alleged repudiation, an unqualified notice of the act relied on to constitute repudiation is necessary. No such notice is shown in the record before us. As a matter of fact, appellant, Atlantic, in its reply brief admits that it was necessary under the rule announced in Kothmann v. Boley, supra, to

prove notice to Atlantic of said repudiation. We are of the opinion that the execution of the top leases to Mr. Moore fails, as a matter of law, to constitute a "repudiation" of the Hilton-Atlantic Lease.

We have considered each of the appellants' contentions raised under their points of error and have concluded that they are without merit. They are each overruled.

Judgment of the trial court is affirmed.