**ATLANTIC RICHFIELD COMPANY et al.,**
**Appellants,**

v.

**J. H. WESTBROOK et al., Appellees.**

**No. 659.**

Court of Civil Appeals of Texas,
Tyler.

Dec. 21, 1972.

Rehearing Denied Feb. 15, 1973.

Shank, Irwin, Conant & Williamson, Ralph B. Shank, Dallas, for Hunt Oil Co.

Ramey, Brelsford, Flock, Hutchins & Carroll, Tom B. Ramey, Jr., Frank L. McClendon, Tyler, for Atlantic Richfield Co. and other appellants herein named other than Hunt Oil Co.

Kliewer & Hood, Edward Kliewer, Jr., Dallas, for appellees.

McKAY, Justice.

Appellees Westbrook and wife and Willis D. Moore, Trustee, brought this suit against Atlantic Richfield Company (hereinafter called Atlantic), Hunt Oil Company (hereinafter called Hunt), and several individuals (as royalty owners) for the title and possession of the mineral fee estate (except the royalty) in a 66.5 acre tract of land in Henderson County, for the termination of the Murphey-Garrett Oil and Gas Lease on the 66.5 acre tract, and for the value of the oil and gas (except the royalty) produced from the Fairway (James Lime) Unit attributable to the 66.5 acre tract on and after November 6, 1964. Appellants Atlantic and Hunt answered by general denial, pleas of "not guilty", and the 2-year statute of limitations. Both appellants and appellees filed motions for summary judgment, and the trial court granted appellees' motion, denied appellants' motion, and this appeal resulted.

J. W. Murphey and wife, Pearl Murphey executed an oil and gas lease for a 10-year primary term covering the 66.5 acre tract to Fred M. Garrett dated April 22, 1954. The lease provided for pooling, but stated that units pooled should not exceed substantially 40 acres each in area for oil and 640 acres for gas, but should governmental authority prescribe or permit larger units, units thereafter created may conform in size to those *prescribed* by governmental regulations. Garrett assigned the lease to the Atlantic Refining Company (now Atlantic Richfield Company) on April 28, 1954. No well has ever been drilled on and no production of oil and gas has ever been obtained from the 66.5 acre tract under the terms of the Murphey-Garrett lease. In March and June, 1961, the Railroad Commission issued orders providing for proration units of 80 acres plus 80 acres tolerance, which order covered the 66.5 acre tract. On September 8, 1961, Atlantic executed a Declaration of Unit purporting to pool the 66.5 acre tract covered by the Murphey-Garrett lease into a pooled unit (Atlantic-Milner Unit) containing 160 acres for production of oil and gas from the James Lime Formation. On the same day, September 8, 1961, Atlantic filed application and notice of drilling with the Railroad Commission, which application and notice showed ownership, acreage and pooling as set out in Declaration of Unit, and on September 19, 1961, Atlantic and Hunt began drilling on the Hunt-Milner 66.5 acre lease, and on December 18, 1961, a well was dually completed from the James Lime Formation and separately from the Rodessa Formation. The James Lime Formation has continued to produce oil without cessation to the present, but the well ceased to produce oil from the Rodessa Formation in July 1966.

On May 23, 1962, the Railroad Commission adopted Operating Rules for the Fairway (James Lime) Field providing proration units of 160 acres and that no unit could be larger than 160 acres. On October 1, 1963, a fieldwide Unit Agreement Fairway (James Lime) Unit was entered into whereby previously pooled units were designated as tracts and unitized into the fieldwide unit, including the Atlantic-Milner 160 acre tract which was designated as Tract 548. On the same day a fieldwide Unit Operating Agreement Fairway (James Lime) Unit was entered into wherein Atlantic is shown to be the working interest owner of the Murphey-Garrett lease. On April 30, 1964, Atlantic executed a ratification of the fieldwide Unit Agreement and Unit Operating Agreement, and adopted, ratified, and confirmed the

same and agreed to become bound by the provisions thereof.

On July 28, 1964, Murphey and wife executed a deed to appellees Westbrook to the surface estate only of the 66.5 acre tract. Then on November 6, 1964, Murphey and wife executed a ratification[1] of the fieldwide Unit Agreement Fairway (James Lime) Unit and to the Unit Operating Agreement Fairway (James Lime) Unit.

On September 23, 1965, Hunt, as field operator, certified the effectiveness of the Fairway (James Lime) Field as of October 1, 1965, and the Railroad Commission, by order dated September 28, 1965, approved said fieldwide Fairway (James Lime) Unit.

On August 9, 1966, Westbrook and wife executed an oil, gas and mineral lease to Willis D. Moore, Trustee, covering the 66.5 acre tract involved here, and on September 13, 1966, the heirs of J. W. Murphey conveyed by what was called correction deeds to Westbrook the interest in the oil, gas and minerals claimed by appellees, such instrument being filed for record May 9, 1967.

The last annual period for which delay rentals were paid under the terms of the lease ended April 22, 1962.

In appellees' motion for summary judgment the contention was made that (1) Atlantic's attempt to pool the 66.5 acre tract covered by the Murphey-Garrett lease into the 160 acre unit was a nullity and legally ineffective to continue the lease in force; (2) the Murphey-Garrett lease terminated April 22, 1962; and (3) that Murpheys

---

1. "RATIFICATION of 'UNIT AGREEMENT' AND 'UNIT OPERATING AGREEMENT'

"Fairway (James Lime) Unit, Henderson and Anderson Counties, Texas

"KNOW ALL MEN BY THESE PRESENTS THAT:

"WHEREAS, each of the undersigned who is or claims to be a Royalty Owner as defined in that certain agreement entered into as of October 1, 1963, entitled 'Unit Agreement, Fairway (James Lime) Unit, Henderson and Anderson Counties, Texas', does hereby acknowledge receipt of a counterpart of said Unit Agreement; and

"WHEREAS, each of the undersigned who is or claims to be a Working Interest Owner, as defined in said Unit Agreement, does hereby acknowledge receipt of a counterpart of said Unit Agreement, and also of a counter-part of that certain agreement entered into as of October 1, 1963, entitled 'Unit Operating Agreement, Fairway (James Lime) Unit, Henderson and Anderson Counties, Texas'; and

"WHEREAS, Exhibits A and B, attached to and made a part of said Unit Agreement, identify the separately owned tracts which may become a part of the Unit Area, subject to the provisions of and as defined in said Unit Agreement; and

"WHEREAS, each of the undersigned represents that it is a Royalty Owner or Working Interest Owner, or both, as defined in said Unit Agreement, in one or more of the Tracts described in Exhibit B thereto or included within the unit outline on Exhibit A thereto, whether or not described or identified in said Exhibit B; and

"WHEREAS, each undersigned Royalty Owner, being familiar with the contents thereof, desires to ratify and confirm said Unit Agreement; and each undersigned Working Interest Owner, being familiar with the contents thereof, desires to ratify and confirm said Unit Agreement and said Unit Operating Agreement.

"NOW, THEREFORE, for the consideration stated in said Unit Agreement, each of the undersigned who is or claims to be a Royalty Owner does hereby adopt, ratify and confirm said Unit Agreement and agrees to become a party thereto and be bound by the provisions thereof; and for the consideration stated in said Unit Agreement and said Unit Operating Agreement, each of the undersigned who is or claims to be a Working Interest Owner only, or both a Working Interest Owner and a Royalty Owner, does hereby adopt, ratify and confirm said Unit Agreement and said Unit Operating Agreement and agrees to become a party thereto and be bound by the provisions thereof. Each of the undersigned joins herein with respect to all of its interest in each and all of the separately owned parcels described by Tracts in Exhibit B or included within the unit outline on Exhibit A to said Unit Agreement, whether or not described in said Exhibit B.

"EXECUTED on the respective dates shown below."

were owners of the mineral fee estate (except the royalty) in the 66.5 acre tract when they executed the ratification of the Unit Agreement and Unit Operating Agreement for the Fairway (James Lime) Field and executed such ratification as "working interest owners."

Appellants' motion for summary judgment contended that the Murpheys, having unqualifiedly adopted, confirmed and agreed to become parties to and bound by the provisions of the fieldwide Unit Agreement and Unit Operating Agreement to which Atlantic was a party, are estopped to claim that their own ratification was insufficient to unitize and pool the 160 acre Atlantic-Milner Unit into the fieldwide Unit Agreement, or to assert that such Atlantic-Milner 160 acre unit had not been ratified, adopted and confirmed by the Murpheys, or that they are not bound by same. Appellants also claimed appellees were estopped to claim the lease terminated, and say that appellees' predecessors in title and the royalty owners ratified Atlantic's lease, the Atlantic-Milner 160 acres (James Lime) Unit, and the fieldwide Unit Agreement and Operating Agreement for the Fairway Field.

Appellants assign 17 points of error and all but one of them are concerned with the crucial issue of the effect the ratification of the unit by the Murpheys had on Atlantic's rights to the oil and gas lease on the Murphey 66.5 acre tract. Therefore, points 1 through 16 will be discussed together.

The trial court found in the judgment that the oil and gas lease on the 66.5 acre Murphey tract terminated, and, therefore, initially it must be decided whether the trial court was correct in finding that the Murphey-Garrett lease terminated on April 22, 1962, the end of the period for which delay rentals had been paid. We have concluded that the lease did terminate on April 22, 1962. In Jones v. Killingsworth, 403 S.W.2d 325 (Tex.Sup., 1966) the precise point in question was decided. The *Jones-Killingsworth* case arose in the Fairway (James Lime) Field with the same pooling language in the lease and the same Railroad Commission rules as are applicable to the instant case. The court held in *Jones-Killingsworth* that "the lessors' land may be pooled only to the extent stipulated in the lease," and that the Railroad Commission rule that larger pooled units of more than 40 acres are *permitted* but are not *prescribed* does not give lessee "power to pool interests in the estate retained by lessor with those of other lessors." The court said such action would require express authority, and that "the orders of the Railroad Commission cannot compel pooling agreements that the parties themselves do not agree upon."

Applying the *Jones-Killingsworth* decision to the case at bar we must conclude that Atlantic did not have the power under the lease to pool and unitize the Murphey 66.5 acre tract with the Hunt-Milner tract into a 160 acre unit; that a producing well on the Hunt-Milner tract would not and did not extend the term of the lease on the Murphey tract without the payment of delay rentals during the primary term; that for failure to pay delay rentals the lease terminated on April 22, 1962. The Railroad Commission rule *permitting* units of not less than 80 acres nor more than 160 acres did not compel pooling agreements that the parties did not agree upon. In addition, the Railroad Commission does not have power to determine property rights. Jones v. Killingsworth, supra.

We next are confronted with the question of the effect of the ratification by the Murpheys on November 6, 1964, of the fieldwide Unit Agreement (James Lime) Unit and Unit Operating Agreement Fairway (James Lime) Unit. In the ratification instrument executed by the Murpheys, who are the predecessors in title to appellees, it was recited that each of the undersigned "who is or claims to be" a Royalty Owner does "adopt, ratify and confirm said Unit Agreement and agrees to become

a party thereto and be bound by the provisions thereof;" and each of the undersigned "who is or claims to be a Working Interest Owner only, or both a Working Interest Owner and a Royalty Owner, does hereby adopt, ratify and confirm said Unit Agreement and said Unit Operating Agreement and agrees to become a party thereto and be bound by the provisions thereof." Appellees claim the Murpheys executed the ratification as working interest owners, but in said Unit Agreement Atlantic was named as the working interest owner of the Murphey tract. By the execution of such ratification instrument the Murpheys recognized that Atlantic was the working interest owner of the tract.

The identical language as found in the Murphey ratification was used in the ratification by the Joneses of the Fairway Unit Agreement and Operating Agreement after the judgment became final in Jones v. Killingsworth, supra. Thereafter, the Joneses sued Hunt and Atlantic for damages for alleged wrongful conspiracy because of the Declaration of Pooling by Hunt, Atlantic and others in the Jones v. Killingsworth case. In Jones v. Hunt Oil Company, 456 S.W.2d 506 (Tex.Civ.App., Dallas, 1970, writ ref., n. r. e.) Chief Justice Williams said: "Appellees' defense of ratification has been established in this record, as a matter of law. * * * Thereafter appellants ratified and confirmed the unit agreement and became active participants in the same. By doing so they became bound to the unit venture fully as if they had joined in the original execution."

We have concluded that the ratification by the Murpheys revived the lease of Atlantic covering the 66.5 acre tract. In Loeffler v. King, 149 Tex. 626, 236 S.W.2d 772 (1951), in an opinion by Judge Hickman, the court held that a royalty deed which recognized the existence of an oil and gas lease which was claimed to have terminated and which was not described or identified, operated as a ratification of the mineral lease with this language:

"By authority of an unbroken line of decisions by this court it must be held that, by the execution and acceptance of the royalty deed the parties ratified and gave new life to the Horwitz lease, even if it had in fact theretofore terminated. Grissom v. Anderson, 125 Tex. 26, 79 S. W.2d 619; Humble Oil & Refining Co. v. Clark, 126 Tex. 262, 87 S.W.2d 471; Greene v. White, 137 Tex. 361, 153 S. W.2d 575, 136 A.L.R. 626; Reserve Petroleum Co. v. Hodge, 147 Tex. 115, 213 S.W.2d 456, 7 A.L.R.2d 288; Leopard v. Stanolind Oil & Gas Co., Tex.Civ.App., 220 S.W.2d 259, Writ Refused, N.R.E."

We do not deem it necessary to analyze all the cases cited in Loeffler; however, in Grissom v. Anderson, (1935) royalty deeds were executed in recognition of an oil and gas lease which was inoperative as to some of the parties. The court there said: (p. 623 of 79 S.W.2d)

"Under the law the Welch lease was inoperative as to Taylor and Frank Anderson and their wives, and the power to make it operative rested exclusively with them. They exercised that power freely and voluntarily. They did not repudiate the Welch lease. On the contrary, a recognition of the lease was made in deeds executed by them in strict conformity with law, and the benefits arising therefrom accepted. *By their acts in executing the royalty deeds above described, they gave the lease life.* Their acts constituted a ratification of the lease. The purposes of the statutes have been fully met. The rights of the parties acquired thereunder became valid and binding. After they have ratified the Welch lease in the manner described above, it is not the policy of the law to permit a repudiation thereof. * * *" (Emphasis added).

Humble Oil & Refining Co. v. Clark, supra, had a similar fact situation as did Reserve Petroleum Co. v. Hodge, supra.

There are numerous cases which have followed the holding in *Loeffler,* and

among them are Copeland v. Stanolind Oil & Gas Company, 279 S.W.2d 893 (Tex. Civ.App., 1955, writ ref., n. r. e.) ; Cockrell v. Texas Gulf Sulphur Company, 157 Tex. 10, 299 S.W.2d 672 (1957) ; Roberts v. Lone Star Producing Company, 369 S. W.2d 373 (Tex.Civ.App., Eastland, 1963, n. w. h.) ; Hastings v. Pichinson, 370 S.W.2d 1 (Tex.Civ.App., San Antonio, 1963, n. w. h.) ; National Bank of Commerce of Houston v. Dunn, 381 S.W.2d 654 (Tex. Civ.App., Houston, 1964, writ ref., n. r. e.) ; Montgomery v. Rittersbacher, 424 S.W.2d 210 (Tex.Sup., 1968) ; Whitaker v. Formby, 469 S.W.2d 241 (Tex.Civ.App., Texarkana, 1971, writ ref., n. r. e.). From the cited cases we believe the rule of ratification or revivor is well established in Texas and that such rule is controlling in the case at bar.

In Summers Oil & Gas, Vol. 5, sec. 970, p. 112 is found this statement: "Execution of a unitization agreement by the lessor in a lease has been held a waiver of all past lease defaults, and ratification of the lease in the unit."

■ We hold that the ratification of the Unit Agreement and the Unit Operating Agreement by the Murpheys was recognition of the validity of Atlantic's lease and revived and restored the lease to Atlantic and recognized and approved the pooling of the 66.5 acre tract with the Hunt-Milner tract as well as with the fieldwide Fairway (James Lime) Unit. The ratification had the effect of prior authority and the units were, therefore, effective from their original effective dates. Yelderman v. McCarthy, 474 S.W.2d 781 (Tex.Civ.App., Houston 1st, 1972, writ ref., n. r. e.). In Hill v. Foster, 143 Tex. 482, 186 S.W.2d 343 (1945) is found this language: "As between the parties to the instrument the ratification takes effect from the time the proper acknowledgment was first made, and such ratification relates back to the effective date of the original instrument."

Appellees contend that Atlantic Richfield Company v. Hilton, 437 S.W.2d 347 (Tex.

Civ.App., Tyler, 1969, writ ref., n. r. e.), opinion of this court by Chief Justice Dunagan, passed upon and foreclosed the question of ratification and estoppel in this case. We disagree. It is true that the ratification and estoppel point was raised by appellants in *Hilton,* but that case was decided on other points. The question of whether ratification of the units by the original lessor would revive an expired or terminated oil and gas lease was not specifically decided. *Hilton* was decided on the question of the repudiation of a lease, and other points raised in that case were determined to be without merit. The *Hilton* opinion does not refer to ratification. We do not consider the ratification question presented here as "necessarily determined by implication" in *Hilton* and binding on us in this case.

■ It is also claimed by appellees that there is no proof of intent by the Murpheys to ratify the terminated Murphey lease and the Atlantic-Milner Unit. We think such contention is without merit. It is said in Sun Oil Company v. Whitaker, 483 S.W.2d 808 (Tex.Sup., 1972): "The rights implied from the grant are implied by law in all conveyances of the mineral estate and, absent an express limitation thereon, are not to be altered by evidence that the parties to a particular instrument of conveyance did not intend the legal consequences of the grant."

Appellees further say that the Murphey ratification did not ratify the Murphey lease or the Atlantic-Milner Unit because the express covenants of the fieldwide Unit Agreement show that the Murpheys and Atlantic agreed that the Murpheys did not intend to, and did not, ratify the Murphey lease or the Atlantic-Milner Unit. They also say that Exhibits A and B to such Unit Agreement (maps designating working interest owners and tract numbers and a list of working interest owners in unit) do not incorporate by reference either the Murphey lease or the Declaration of the Atlantic-Milner Unit. Appellees argue that when the Murphey lease termi-

nated the Murpheys then became working interest owners and they therefore signed the ratification as working interest owners. They had sold their royalty, it is argued, so they could not have signed as royalty owners.

The ratification instrument was prepared for execution by any party "who is or claims to be a Royalty Owner as defined in that certain agreement entered into as of October 1, 1963, entitled 'Unit Agreement, Fairway (James Lime) Unit, Henderson and Anderson Counties, Texas,' * * *" or "who is or claims to be a Working Interest Owner, as defined in said Unit Agreement, * * *."

The Unit Agreement Fairway (James Lime) Unit provided:

"1.4 *Working Interest* means an interest in Unitized Substances by virtue of a lease, operating agreement, fee title or otherwise, including a carried interest, which is chargeable with and obligated to pay or bear, either in cash or out of production or otherwise, all or a portion of the cost of drilling, developing, producing and operating the Unitized Formation. Any interest in Unitized Substances which is a Working Interest as of the date the owner thereof executes or ratifies this agreement shall thereafter be treated as a Working Interest for all purposes of this agreement.

"1.5 *Working Interest Owner* means a party hereto owning a Working Interest. The owner of Oil and Gas Rights free of lease or other instrument conveying the Working Interest to another shall, with respect to such Oil and Gas Rights, be regarded as a Working Interest Owner to the extent of seven-eighths ($\frac{7}{8}$) of its interest in Unitized Substances and as a Royalty Owner with respect to its re-

maining one eighth ($\frac{1}{8}$) interest therein."

■ The Murpheys may have been (after the termination of the Murphey lease and before they executed the ratification of the Unit) in a position to negotiate [2] with the other working interest owners and field operator to become a working interest owner in the unit, but this they did not do. They may have been in position to demand that the Unit Agreement and the Operating Agreement and the exhibits attached thereto be amended to show that they were working interest owners and that they would bear their proportionate share of the cost of drilling, equipping and production. They did not do so. They could have repudiated Atlantic's lease. They chose instead to execute the ratification of the Unit by which they adopted, ratified, confirmed and agreed to become bound by the provisions of the Unit Agreement. These provisions and exhibits showed Atlantic to be the owner of the working interest on the Murphey 66.5 acre tract. Under the circumstances presented here the Murpheys made no representation or claim to any party that they were working interest owners in the unit, nor did they demand to be recognized as such. Their claim that they executed the ratification as working interest owners and should be recognized as such now comes too late. After they executed the ratification without qualification it did not matter whether they were working interest owners or royalty owners. They could not claim to be working interest owners in the unit and at the same time recognize and agree that another was the working interest owner of the same interest. We believe this claim is without merit.

Appellees also contend that references to the Unit Agreement and the operating

2. "9.2 *Subsequent Commitment of Interest to Unit.* After the effective date of this agreement, the commitment hereto of any Interest in any Tract within the boundary of the unit outline, as shown on initial

Exhibit A hereto before any revision thereof, shall be upon such terms as may be negotiated by Working Interest Owners and the owner of such Interest."

agreement and exhibits attached were for descriptive purposes only in the Murphey ratification. The ratification, in referring to the Unit Agreement or Operating Agreement or the exhibits thereto, does not limit itself in such references to descriptive purposes only, so, therefore, the references in the ratification are not so limited. Harris v. Windsor, 156 Tex. 324, 294 S.W.2d 798 (1956).

There is no contention made by any party that there is a genuine issue of fact. Both appellants and appellees attach many exhibits to their motions for summary judgment. In view of the disposition of the case there is no need to discuss appellants' point 17.

We conclude the trial court should have granted the motion for summary judgment of appellants and should have denied the motion for summary judgment of appellees. Consequently, the judgment of the trial court is reversed and judgment is rendered for appellants.

## ON MOTION FOR REHEARING

Appellees have filed their Motion for Rehearing setting out twenty-one (21) assignments of error. The first fourteen of these are directed at our holding that the Murpheys by executing the unit ratification, ratified or revived the Murphey lease and ratified the Declaration of the Atlantic-Milner Unit and agreed or recognized that Atlantic was the working interest owner in the Murphey tract. They contend the Murphey ratification was not sufficient to ratify or revive the Murphey lease, which under Jones vs. Killingsworth had terminated on April 22, 1962, and *that the Murpheys ratified the unit but did not ratify the lease because the unit and not the lease is described in the exhibit attached to the unit agreement.*[1] We do not agree.

Section 3.3 of the Unit Agreement provides in part:

"3.3 *Amendment of Leases and Other Agreements.* The terms and provisions

of the various leases, agreements division and transfer orders, or other instruments covering the respective Tracts or the production therefrom are *hereby amended* only to the extent necessary to make them conform to the terms and provisions of this agreement, *but otherwise are to remain in full force and effect.* * * *"

By virtue of this provision the Murpheys not only specifically ratified the lease but amended it as well.

Section 3.1 of the Unit Agreement provides as follows:

"3.1 *Oil and Gas Rights Unitized.* Subject to the terms and conditions of this agreement, all the Oil and Gas Rights of the Royalty Owners in and to the lands included within the unit area on Exhibit A, whether or not described or identified in Exhibit B, and all of the Oil and Gas Rights of the Working Interest Owners in and to said lands are hereby unitized insofar as said respective Oil and Gas Rights pertain to the Unitized Formation, *all to the same extent as if the right to search for, develop, operate and produce from the Unitized Formation had been included in a single lease* executed by all the Royalty Owners, as lessors, in favor of all the Working Interest Owners, as lessees, *and as if said lease had been subject to all of the terms and conditions of this agreement.*"

When the Murpheys signed the unit ratification they amended their lease to conform with the above paragraph. They committed their reversionary mineral interest to the unit.

We stated in our original opinion that ratification of the unit by the Murpheys recognized and approved the pooling of the Murphey 66.5 acre tract with the Hunt-Milner tract into the 160 acre Atlantic-Milner unit. Section 3.4 of the Unit Agreement provides as follows:

"3.4 *Continuation of Leases, Term Mineral Interests and Term Royalties.*

---

1. Emphasis added throughout.

Unit operations, as herein defined, conducted with respect to the Unitized Formation on any part of the Unit Area, including drilling operations on or production from any part of the Unitized Formation, *shall,* except for the purpose of determining payments to Royalty Owners, *be considered as operations upon or production from each Tract and such Unit Operations or production shall continue in force and effect each lease* or term mineral interest, or term Royalty Interest *just as if such Unit Operations had been conducted and a well had been drilled on and was producing from each such tract."*

It appears that the above provision renders it immaterial whether the Murpheys ratified the 160 ac. Atlantic-Milner Unit. The Murpheys agreed that production from or operations upon any part of the unit *would be considered as production from or operations upon each tract and would therefore continue in force each lease in the unit.*

We did not make clear in our original opinion that by the order of May 23, 1962, the Railroad Commission *prescribed* units of 160 acres. But in any event, we believe under the facts and authorities set out in our original opinion together with the quoted portions of the Unit Agreement set out above that the Murpheys ratified and amended their lease; that they ratified the field-wide unit; that Atlantic ratified the field-wide unit and committed the working interest to the unit; that the Murphey lease was maintained in effect after being ratified by virtue of the provisions of the unit agreement.

With reference to the matter of intent on the part of the Murpheys in signing the ratification, we briefly will review the record. The lease terminated on April 22, 1962, and then two and one-half years later the Murpheys executed the ratification. Then on December 8, 1965, the Supreme Court opinion in Jones v. Killingsworth, which gave rise to this case, was delivered,

with Motion for Rehearing denied on April 20, 1966. Almost five years after the termination of the lease, and two and one-half years after the Murpheys signed the ratification, to-wit; May 9, 1967, this case was filed. The record does not disclose that the Murpheys did anything toward collecting their claimed part of the proceeds from production as a working interest owner for the two and one-half year period after they signed the ratification. The Murpheys did not comply with the provisions of the Unit Agreement which required working interest owners to advise the unit operator in writing the names and addresses of its representatives, pay or cause to be paid all production, severance, gathering and other taxes, and to reimburse unit operator for owner's share of unit expense. It appears the Murpheys did intend to ratify the lease. A reasonably prudent man would most likely have taken some step to collect approximately 40% of the production attributable to one of the units for two and one-half years if he thought he owned the interest.

Appellees' Motion for Rehearing is overruled.