186 So.2d 337 (1966)
W. C. KAUFMAN, Jr., Plaintiff-Appellant,
v.
ARNAUDVILLE COMPANY, Inc., et al., Defendants-Appellees.
No. 1703.
Court of Appeal of Louisiana, Third Circuit.
April 27, 1966.
On Application for Rehearing May 25, 1966.
Writ Refused June 30, 1966.
*338 Knight & Knight, by Herschel N. Knight, Jennings, for plaintiff-appellant.
Liskow & Lewis, by Austin W. Lewis, New Orleans, and Richard E. Gerard, Lake Charles, for defendant-appellee.
Before TATE, SAVOY and CULPEPPER, JJ.
SAVOY, Judge.
This matter is on appeal by plaintiff from a judgment of the district court rejecting his demands and dismissing his suit.
The facts of the instant case have been correctly summarized by the trial judge in his written opinion, and we hereby quote same as follows:
"Plaintiff seeks to have the court declare invalid an oil, gas and mineral lease. Cancellation of the lease would permit plaintiff, as landowner, to participate as a working interest owner instead of as a royalty owner in four units created by the Commissioner of Conservation of the State of Louisiana in each of the six sands discovered in the Welsh Field. Four of the unitized sands were producing minerals in substantial quantities at the time suit was instituted.
"There is no dispute as to the facts.
"Plaintiff, W. C. Kaufman, Jr., owns an undivided 1/3 interest in a strip of land in the NW/4 of Section 27, Township 9 South, Range 5 West, approximately 80 feet in width by 2600 feet in length. Mr. Kaufman leased his interest to Arnaudville Company, Inc., July 6, 1960, and delay rentals were paid to maintain the lease to July 6, 1963, the end of the primary term.
"The lease authorizes lessee to create, without further approval of lessor, units not exceeding substantially 40 acres for an oil well and substantially 160 acres for a gas well. Recordation of an instrument describing the pooled acreage is required to make the unit effective. The unit clause in the Kaufman lease contains, among other provisions, the following:
"`Any unit formed by Lessee hereunder may be created either prior to the drilling or after the completion of the unit well.'
"On March 1, 1963, Arnaudville Company assigned to B. M. Hester the Kaufman lease and other leases in the Welsh Field affecting lands adjacent to the Kaufman strip. On April 19, 1963, Hester secured a permit from the Department of Conservation of the State of Louisiana to drill a well approximately in the center of a unit designated `Pan American Unit No. 1' comprising the SW/4 of NW/4 of NW/4 of Section 27, Township 9 South, Range 5 West. On the day he secured the permit, Hester commenced operations for the drilling of the Pan American Unit No. 1 Well at the authorized location. On May 6, 1963, Hester executed and, on May 19, 1963, recorded in Jefferson Davis Parish of declaration creating the unit referred to in his well permit. This unit includes the western ¼ of the narrow strip covered by the Kaufman lease. The unit well was spudded on May 5, 1963, and on May 16, 1963, it was logged to a depth of 4722 feet. On or about May 17, 1963, the hole bridged over at a depth of 1294 feet and was lost from that depth to a depth of 5191 feet. On May 18, 1963, under a new permit from the Department of Conservation, drilling was commenced in a sidetracked hole and on May 25, 1963, the well was logged to a total depth of 6461 feet in the sidetracked hole. On June 3, 1963, the well was perforated for production at a depth of 5,893 feet to 5,901 feet. Attempts were made to complete this well as follows:
"(a) On June 4, 1964, from perforations from 5,893' to 5,901'.
"(b) On June 13, 1963, from perforations from 5,624' to 5,629'.
"(c) On June 20, 1963, from perforations 3,454' to 3,460.
"(d) On December 12, 1963, from perforations 3,448' to 3,454'.
*339 "From all perforations, the well flowed oil and gas intermittently, a tank battery and production facilities were installed, but despite lessee's efforts, the well could not be made to produce in commercial quantities. Attempts to swab the well in as a producer were made by lessee on August 8, 17, 19, 21, October 3, December 12, 19 and 24th, 1963, and on March 5, through 12, 1964.
"The last swabbing and bailing was done on this well in an attempt to complete it as a producer March 12, 1964, and the well was formally abandoned March 13, 1964.
"On December 12, 1963, B. M. Hester assigned to Haynes Oil & Gas Company all of Hester's right, title and interest in the Kaufman and other leases owned by Hester in the Welsh Area.
"By declaration dated January 6, 1964, recorded January 22, 1964, Haynes Oil & Gas Company, owner of the Kaufman lease and the other leases involved, created a unit designated the Pan American Unit No. 4, which includes the eastern ¼ of the Kaufman tract. On February 15, 1964, Haynes commenced the drilling of a well at approximately the center of the Pan American Unit No. 4 and completed this well as a dual producer of oil on or about March 13, 1964. Subsequently, Haynes declared a third unit designated Pan American Unit No. 3. This unit also includes a part of the strip covered by the Kaufman lease. On April 30, 1964, Haynes commenced the drilling of a well at approximately the center of this unit, and on June 30, 1964, completed this well as a dual producer of oil.
"On May 26, 1964, Haynes assigned to H. L. Hawkins and H. L. Hawkins, Jr., an undivided 1/3 interest in the Kaufman and other leases owned by Haynes in this area. Subsequently, on August 19, 1964, Haynes assigned to H. L. Hawkins and H. L. Hawkins, Jr., its remaining 2/3 interest in the Kaufman and other leases owned by Haynes in the Welsh Area.
"After the completion of the Haynes Oil & Gas Company Pan American Unit No. 4 Well on the unit comprising the SE/4 of NE/4 of NW/4, Section 27, Township 9 South, Range 5 West, Haynes Oil & Gas Company circulated and there was executed by every interested lessor and royalty owner an act setting forth the respective interests of each owner in unit production, listing all of the oil, gas and mineral lease involved in the unit and containing the following provision:
"`In consideration of the execution of this division order by the remaining parties named below and in consideration of the payments to be made to them pursuant to the terms of this instrument, each party executing this agreement acknowledges that the lease executed by him and described above is fully effective at this time and each party ratifies the unit created by Haynes Oil & Gas Company, dated January 6, 1964 and recorded in the Conveyance Records of Jefferson Davis Parish, Louisiana in Book 272, under Entry No. 288578.'
"Plaintiff signed and returned this act June 10, 1964.
"All of the acts of ratification were recorded in the Records of Jefferson Davis Parish prior to January 26, 1965, when H. L. Hawkins and H. L. Hawkins, Jr., assigned to West American Oil Company the Kaufman and other leases which were listed in the ratification. Until the trial of this suit, when plaintiff's attorney orally amended the petition in open court, the ratification was never repudiated or rescinded by plaintiff.
"On February 24, 1965, West American Oil Company assigned the Kaufman and other Welsh leases to Union Oil Company of California reserving a production payment which was mortgaged by West American Oil Company to defendant, Security First National Bank.
"Arnaudville Company, Inc., assigned to defendant, W. R. Farley, a portion of the overriding royalty interest reserved by Arnaudville Company in its assignment of *340 the Welsh leases to Hester, and on April 7, 1965, Farley mortgaged this overriding royalty interest to defendant, Calcasieu-Marine National Bank, Lake Charles, Louisiana.
"From the date of first unit production until December 1, 1964, the wells drilled by Haynes Oil & Gas Company and Hawkins & Hawkins on lands of Pan American Petroleum Corporation in the Pan American Unit 3 and Pan American Unit 4 produced under the declared units. Plaintiff, Kaufman, was paid royalties on production from these wells, even though the wells were located on land of Pan American Petroleum Corporation. Had it not been for the declared units, plaintiff, Mr. Kaufman, would not have participated or have had any rights as a royalty owner or otherwise, in production secured during that period from the two wells on Pan American's land.
"Effective December 1, 1964, the Commissioner of Conservation created units for the production of oil and gas from each of the six sands which had been discovered in the Welsh Field. The Commissioner's units comprised governmental quarter-quarter-quarter sections and coincided with the limits of the units declared by Hester and Haynes. From December 1, 1964, to the date of the stipulation, plaintiff, Mr. Kaufman, was paid royalties under these Commissioner's units, but, of course, if Mr. Kaufman should be successful in cancelling the lease originally granted by him to Arnaudville Company, Mr. Kaufman would participate as an unleased working interest owner in the Commissioner's units.
"Mr. Kaufman has not cashed, but has retained and never returned the checks sent to him in payment of unit royalties. * *"
Due to the death of an uncle of counsel for plaintiff, the matter was submitted to this Court on briefs.
In his brief counsel for plaintiff has designated the following Specification of Errors:
"The trial court erred in the following respects:
"1. In holding that the division order executed by the plaintiff on June 7, 1964 amounted to a ratification of the unit, and thereby perpetuated the Oil, Gas and Mineral lease until such time as a valid unit was formed incorporating plaintiff's land therein;
"2. In failing to note that the division order, carrying with it ratifying language, was by its own terms and conditions revocable at the will of the plaintiff herein;
"3. By suggesting, even though not deciding, that the lands of plaintiff were validly unitized pursuant to a voluntary pooling agreement filed in accordance with the terms of the Oil, Gas and Mineral lease;
"4. By suggesting, even though not deciding, that there were sufficient operations of a bona fide and diligent nature that would perpetuate the unit, assuming the same to have been validly formed until such time as the land was admittedly validly unitized with a producing well."
Counsel for defendants on the other hand maintain that the judgment of the trial court is correct and should be affirmed. Defendants' defense to the suit is three-fold, namely:
"(1) That the unit declaration recorded May 9, 1963, was in strict accordance with the pooling provisions of the lease since the recordation was accomplished prior to the completed act of drilling; further that plaintiff's attempt to nullify the declaration would require a judicial revision of the pooling clause through the insertion of the words `commencement of drilling.
"(2) That the Hester operations of the unit created by this declaration were sufficient to maintain the lease in effect until production was later obtained from a second well, plaintiff having failed to meet the burden imposed upon him by law to establish the lack of continuous operations.

*341 "(3) That in any event, plaintiff on June 7, 1954, executed an instrument acknowledging that the lease was fully effective and specifically ratifying the unit of which the lease formed a part and that plaintiff is thereby estopped to repudiate the declarations made in this solemn act of ratification."
The record reflects that plaintiff is engaged primarily in the oil and gas business and has been actively engaged in that field for fifteen years or more. That prior to the signing of the division order in the instant case, he had written correspondence with land owners who owned lands in the vicinity of the property in litigation; with the Conservation Department of the State of Louisiana; and with Mr. Richard E. Gerard, attorney for some of the defendants herein.
After a reading of the record in this case and the authorities cited by the attorneys for the parties, we are of the opinion that the ratification of the oil, gas and mineral lease, executed by plaintiff on July 6, 1960, in the division order which plaintiff signed on June 7, 1964, estops him from contesting the validity of said lease.
In the case of Gaines v. Crichton, 187 La. 345, 174 So. 666, the Supreme Court said:
"Where a party solemnly admits a fact by deed, he is estopped from not only disputing the deed itself, but also every fact which the deed recites. * * *" (Citations omitted)
Counsel for plaintiff also contends that the following language found in the division order signed by plaintiff allows him to revoke at his option the instrument of June 7, 1964:
"* * * until further notice you will give credit for oil, condensate, and distillate received from the said land, as per directed below."
This argument is also without merit. The lease signed by plaintiff provides that the lessor has the right to take his production in kind if he so desires, provided he furnish tanks for the storing of said production from the leased property. If no tanks are furnished, lessee is authorized to sell lessor's oil and pay lessor for same. In the division order lessor authorized lessee "until further notice" to take the production, sell it and transmit the proceeds to plaintiff. The clause "until further notice" has to do only with the optional method granted to lessee of disposing of the oil received by plaintiff under the lease executed by him.
The last contention on this subject is that plaintiff was lead to sign the division order by certain written statements made by Mr. Gerard in connection with a discussion between the parties as to the validity of a conventional unit created by the assignee of plaintiff's lessee, and which unit included a portion of the land owned by plaintiff and described in the lease of July 6, 1960. Counsel for plaintiff complains that because of the statement of Mr. Gerard a legal fraud was perpetrated on plaintiff, thus nullifying the division order and ratification of the lease.
LSA-C.C. Article 1847 states:
"Fraud, as applied to contract, is the cause of an error bearing on a material part of the contract, created or continued by artifice, with design to obtain some injust advantages to the one party, or to cause an inconvenience or loss to the other. * * *"
After reading the correspondence between the parties as to the unit, we are unable to find where Mr. Gerard misled plaintiff. As a matter of fact, Mr. Gerard was frank and helpful to plaintiff and even suggested that plaintiff contact the attorneys for the assignees of plaintiff's lease and who were the operators of the unit well.
Fraud is never presumed and to sustain such a serious charge, the strongest of proof is required. Mr. Gerard is an attorney of the Lake Charles Bar and is a gentleman of unquestioned integrity.
*342 Having found the ratification of the lease by plaintiff is sufficient to estop him from now contesting its validity, it is unnecessary to discuss the other grounds relied on by counsel for plaintiff for cancellation of the lease executed by plaintiff.
For the reasons assigned, the judgment of the district court is affirmed. Appellant to pay the costs of this appeal.
Affirmed.

On Application for Rehearing
EN BANC.
PER CURIAM.
In his application for rehearing, counsel for the plaintiff-appellant states that our decision will have serious impact as impregnating with irrevocability a division order signed by the landowner-lessors with the mineral-lease assignee authorizing the latter "until further notice" to make payment upon mineral production based upon the division of ownership interest reflected by the agreement.
Our decision was not so intended. The ordinary rule concerning division orders is as stated in the 1964 Supplement to Merrill, Covenants Implied in Oil and Gas Leases (1940), Section 209A, p. 215:
"A division order is a document executed by operators and royalty owners directed to the purchaser of oil or gas authorizing the latter to accept production from the described premises, upon stated terms, specifying the price at which settlement is to be made, and setting forth the interests of the respective parties in the premises as the basis on which payments are to be made to them by the purchaser. The execution of such a document is required almost universally by purchasers * * * the purpose for which the order is executed and the type of economic duress which prescribes it repel the implication that it is intended to affect the obligations of the operator to the royalty owner. The better reasoned decisions are in accordance with this view, and hence the mere execution of a division order, or the acceptance of payments in accordance therewith from the purchaser, ought not to preclude the royalty owner from asserting a breach of implied covenant obligation against the operator.

* * * * * *
"Of course, incidents surrounding the execution of the division order and the actions of the parties under it may justify a finding that the royalty owner is estopped to claim that particular conduct of the operator is a breach of obligation. Likewise, it is entirely possible that a division order might be executed under such circumstances as to constitute a contractual modification of the relations previously prevailing between operator and royalty owner. But this should appear clearly. No court ought to infer an intent to enter into such a contractual modification without cogent evidence thereof."
See also: 3A Summers, Oil and Gas, Section 590 at pp. 137-142 (1958); Bounds, "Division Orders", Southwestern Legal Foundation, Fifth Annual Institute on Oil and Gas Law 91 (1954); Manual of Oil & Gas Terms, verbo "Division order", p. 66 (1957); Comment, Royalty Division Orders, 23 La.L.Rev. 571 (1963). Also; White v. Hodges, 201 La. 1, 9 So.2d 433; Brown v. Sugar Creek Syndicate, 195 La. 865, 197 So. 583 (holding clarified in Gulf Refining Co. v. Goode, 212 La. 502, 32 So. 2d 904 at 907); Brown Land & Royalty Co. v. Green, CA 5, 198 F.2d 74 (1952); Porter-Wadley Lumber Co. v. Bailey, CA 5, 110 F.2d 974 (1940).
However, the execution of the present division order involved more than the routine signing of a terminable agreement authorizing division of the production according to the interest specified. Here, the various leases were specifically described *343 and the plaintiff and all other lessors involved, in consideration of their participating in production from a well located on lands of Pan American Petroleum Corporation, agreed that their respective leases were "fully effective at this time" and ratified the creation of the unit, the validity of which is now questioned by the plaintiff. After listing every one of the oil, gas and mineral leases involved in the unit, the act contained the following provision:
"In consideration of the execution of this division order by the remaining parties named below and in consideration of the payments to be made to them pursuant to the terms of this instrument, each party executing this agreement acknowledges that the lease executed by him and described above is fully effective at this time and each party ratifies the unit created by Haynes Oil & Gas Company dated January 6, 1964, and recorded in the Conveyance Records of Jefferson Davis Parish, Louisiana, in Book 272, under Entry No. 288578."
Plaintiff is a highly successful, well educated and sophisticated oil man. He did not sign his division order and ratification lightly. Before the plaintiff signed the act, he wrote letters to the Lake Charles office of the Louisiana Department of Conservation, and to seven of his acquaintances in Louisiana and Texas inquiring as to the status of his lease. In one letter (item (i) attached to Request for Admissions) plaintiff stated:
"This interest is not large enough to justify the expense of an on-the-ground investigation, however, it appears to be sufficiently substantial that I don't want to sign a division order which might ratify a lease which might otherwise be invalid." (Italics ours.)
After satisfying himself from the replies to these inquiries that the lease obligations had been complied with, the plaintiff signed the act and sent it to the Lessee with the plaintiff's letter of June 10, 1964 (item (p) attached to Request for Admissions), stating:
"I want to express my most sincere appreciation for your very explanatory letter of June 2. I hope you won't feel that I am an `obstreperous non-resident royalty owner.' In recent years most of my interests have been working interests wherein the periodic reports kept me current on all activities. My complete lack of knowledge as to current Louisiana procedures and lack of any information on this prospect prompted what may appear to be an over-abundance of caution. Accordingly, I have executed and am enclosing the division order furnished with your memo of May 22."
Under all of the circumstances reflected by the plaintiff-lessor's execution of the present division order, therefore, we think he is estopped now to claim that the lease was no longer valid when he signed the division order on June 10, 1964. The division order expressly acknowledged the validity of the present and all other leases affecting the productive tract, in consideration of the execution of similar agreements by the other landowner-lessors and other royalty owners. The circumstances reflect an intentional acknowledgment by the plaintiff-lessor of the validity of the lease and a knowing waiver by him of any right to urge its invalidity, the consideration being the mutual benefits accruing to him and to the other lessor interests who signed likewise to acknowledge the validity of all the leases affecting the producing tract.
For these reasons, we do not find the plaintiff-appellant's contention on rehearing well founded that in our original opinion we accorded the division order signed by him greater binding effect than justified by law. Accordingly, the application for rehearing is denied.
Application denied.