J. H. WESTBROOK et al., Petitioners,

v.

ATLANTIC RICHFIELD COMPANY et al.,
Respondents.

No. B–3904.

Supreme Court of Texas.

Nov. 28, 1973.

Rehearing Denied Jan. 9, 1974.

Kliewer & Hood, Edward Kliewer, Jr., Dallas, for petitioners.

Ramey, Brelsford, Flock, Hutchins & Carroll, Tom B. Ramey, Jr. and Frank L. McClendon, Tyler, Shank, Irwin, Conant, Williamson & Grevelle, Ralph B. Shank, Dallas, for respondents.

McGEE, Justice.

J. H. Westbrook, et ux, and William D. Moore, Trustee (hereinafter called Plaintiffs), brought this suit against Atlantic Richfield Company (Atlantic), et al (hereinafter called Defendants), for title and possession of the mineral fee estate (except the royalty) in a 66.5 acre tract of land, for the termination of the Murphey-Garrett oil and gas lease covering the 66.5 acres, and for the value of the oil and gas (except the royalty) produced from the Fairway (James Lime) Unit attributable to the 66.5 acre tract on and after November 6, 1964. The trial court rendered summary judgment for Plaintiffs holding that the Murphey-Garrett lease terminated on April 22, 1962 for failure to pay delay rental, and that the lease was not revived by the subsequent execution by Murphey (Plaintiffs' predecessor in title) of a ratification on November 6, 1964 of the fieldwide Fairway (James Lime) Unit Agreement and the Fairway (James Lime) Unit Operating Agreement. The cause of action for accounting was severed out of this proceeding. The court of civil appeals reversed the judgment of the trial court and rendered judgment in favor of Defendants. 491 S.W.2d 207 (Tex.Civ.App.—Tyler 1972). We reverse the judgment of the

court of civil appeals and affirm the judgment of the trial court.

At the outset we will list in chronological order the events giving rise to this lawsuit:

April 22, 1954: Murphey and wife executed an oil and gas lease covering the 66.5 acre tract to Garrett.

April 28, 1954: Garrett assigned the Murphey-Garrett lease to Atlantic.

May 31, 1961: Royalty deed dated this day conveyed any royalty interest of Murphey and wife to C. Curtis Reese.

September 8, 1961: Atlantic executed a Declaration of Unit purporting to pool the 66.5 acre Murphey tract with the Hunt-Milner tract into the 160 acre Atlantic-Milner unit.

September 19, 1961: Drilling began on the Hunt-Milner tract.

December 18, 1961: A well was completed from the James Lime Formation on the Hunt-Milner portion of the Atlantic-Milner unit.

April 22, 1962: The period expired for which lessee had paid delay rental under the Murphey-Garrett lease.

October 1, 1963: A fieldwide Fairway (James Lime) Unit Agreement was entered into whereby previously pooled units were designated as tracts and unitized into a fieldwide unit.

October 1, 1963: A fieldwide Fairway (James Lime) Unit Operating Agreement was entered into showing Atlantic to be the working interest owner of the Atlantic-Milner tract. The Murphey-Garrett lease was not specifically referred to.

April 30, 1964: Atlantic ratified the fieldwide Unit Agreement and the Unit Operating Agreement.

July 28, 1964: Murphey and wife executed a deed to J. H. Westbrook conveying the surface estate of the 66.5 acre tract.

November 6, 1964: Murphey and wife executed a ratification of the fieldwide Unit Agreement and fieldwide Unit Operating Agreement.

August 9, 1964: Westbrook and wife executed an oil and gas lease to William Moore, Trustee, covering the 66.5 acre tract.

September 16, 1966: The heirs of Murphey conveyed their interest in oil, gas and minerals in the 66.5 acre tract to Westbrook by an instrument designated a correction deed.

■ The crucial issue in this case is the effect that ratification of the Fairway (James Lime) Unit Agreement (hereafter called Unit Agreement) and Fairway (James Lime) Unit Operating Agreement (hereafter called Unit Operating Agreement) by the Murpheys on November 6, 1964 had on Atlantic's rights to the Murphey-Garrett lease. The trial court and the court of civil appeals correctly held the Atlantic-Milner unit was unauthorized so that the Murphey-Garrett lease terminated on April 22, 1962 at the end of the period for which delay rentals had been paid. Jones v. Killingsworth, 403 S.W.2d 325 (Tex.1965).

Defendants do not contend that the Murpheys revived the expired Murphey-Garrett lease by receiving royalty payments under the lease after its expiration. Nor do Defendants contend that the Murpheys executed any deed or lease subject to or acknowledging the Murphey-Garrett lease. The expired Murphey-Garrett lease could therefore be revived only if the ratification instrument contained words of ratification or revival, or if the Unit Agreement or Unit Operating Agreement ratified the Murphey-Garrett lease. We hold none of those instruments revived the Murphey-Garrett lease.

We hold that the ratification of the Unit Agreement set out in the margin of the court of civil appeals opinion did not revive or ratify the Murphey-Garrett lease. There is no provision whereby persons executing the instrument indicate whether they ratify the agreements as royalty or working interest owners. The instrument contains no affirmative statement as to the validity of underlying interests but only ratifies the Unit Agreement and Unit Operating Agreement. If then the Murpheys had ratified the Murphey-Garrett lease the revival would of necessity be found in the Unit Agreement or Unit Operating Agreement.

We hold that the Unit Agreement did not ratify the Murphey-Garrett lease. At the time the Murpheys executed the agreement they owned no royalty interest. They owned the mineral fee (except the royalty interest) free of lease. The Murpheys, therefore, executed the ratification as a "working interest owner" according to Section 1.4 of the Unit Agreement which defines ownership of the mineral estate "free of lease" as being a "working interest." Section 1.4 goes on to say that any interest which is a working interest on the date the owner executes or ratifies the Unit Agreement "shall thereafter be treated as a Working Interest for all purposes of this agreement." Nor is there any possibility the Murpheys signed in the status of "Royalty Owner" when the Murpheys owned no royalty interest in the tract on November 6, 1964, and when Section 1.6 defines "Royalty Interest" as an interest "other than a Working Interest."

The rest of the Unit Agreement is consistent with the Section 1.4 which designates the Murpheys' status as working interest owners. Section 3.5 of the Unit Agreement provides "nothing herein shall be construed to result in the transfer of title to the oil and gas rights covered hereby between the parties hereto or to unit oper-

ators." Furthermore, Section 6.2 of the Fairway Unit Agreement provides:

"The unitized substances allocated to each Tract shall be distributed among . . . the parties entitled to share . . . *in the same proportions, and upon the same conditions as they would have participated and shared in the production from such tract, or in the proceeds thereof, had this agreement not been entered into, and with the same legal effect.* If any Oil and Gas Rights in a tract *are now* or hereafter become divided and owned in severalty [Murphey's status] as to different parts of the Tract, *the owners of the divided interests,* in the absence of an agreement providing for a different division, shall share in the Unitized Substances allocated to the Tract . . . on an acreage basis." [1]

In view of the clear provisions of Section 1.6, 3.5 and 6.2 the Fairway Unit Agreement does not ratify or revive the Murphey-Garrett lease as a matter of law.

We further hold that the Fairway Unit Operating Agreement does not ratify the Murphey-Garrett lease. Although the Murpheys therein recognize Atlantic as working interest owner of Tract 548 of the Fairway Unit, which includes the 66.5 acre Murphey tract *sub silentio,* any revival of the Murphey-Garrett lease is prevented by the clear agreement of the parties. Section 4.1 of the Unit Agreement provides in the event of any conflict between the Unit Agreement and Unit Operating Agreement, the Unit Agreement *"shall govern."* The Unit Agreement's designation of Murphey as working interest owner therefore prevails over the designation of Atlantic as such owner by the Unit Operating Agreement.

The same result would follow even without the conflict provision of the Unit Agreement. The only possibly compromis-

---

1. All emphasis is added by the Court unless otherwise stated.

ing portion of the Unit Operating Agreement is a provision in an appendix to that agreement showing Atlantic to be operator of the Milner tract numbered 548, with Atlantic Refining Co. as 51.19438 percent working interest owner of the tract and Hunt Oil Co. owning a 48.80562 working interest in the tract. We hold there is no sufficient reference to the Murphey-Garrett lease to revive it or to the Atlantic-Milner unit to ratify it.

In Loeffler v. King, 149 Tex. 626, 236 S.W.2d 772 (1951) it was argued that the language, "It is distinctly understood and herein stipulated that said land is under an Oil and Gas lease made by Grantor [sic] providing for a royalty . . . ," contained in a royalty deed was insufficient to ratify the mineral lease that we assumed to have terminated. This Court said at 149 Tex. 626, 236 S.W.2d 772 at 774:

> "The trial court held that by the acceptance of this deed Loeffler ratified the Horwitz lease. The Court of Civil Appeals held that the language above quoted was not a sufficient identification of any lease to constitute a ratification thereof. We agree with the holding of the trial court on that question."

The Court went on to show under the facts of the case before it that the language was sufficient to indicate an intent by Loeffler to refer to a particular lease. The Court then announced a rule of ratification that required less specificity to ratify leases than to assign leases, and cited a long line of authority for the proposition that execution and acceptance of a royalty deed ratifies an existing lease. The Court concluded that if the lease reference does not refer to the terminated lease, then the language must have referred to a lease by the co-tenant of the lessor, so that the identical provisions would have been ratified.

In Reserve Petroleum Co. v. Hodge, 147 Tex. 115, 213 S.W.2d 456 (1948) the Court addressed the question whether the following language in an oil and gas lease was sufficient to revive mineral deeds assumed to be void:

> "All lessors herein agree that mineral deeds properly executed and now of record conveyed to G. T. Blankenship an undivided ⅛th interest, and to Farmers Royalty Holding Company, a Delaware Corporation, an undivided ⅜th interest in and to all oil, gas and other minerals in, under and upon the lands described herein and that the minerals in and under said land are now owned in the [following] proportions. . . . "

In holding the deeds revived, the Court examined Grissom v. Anderson, 125 Tex. 26, 79 S.W.2d 619 (1935), and Greene v. White, 137 Tex. 361, 153 S.W.2d 575 (1941), noted their "express reference" of the latter instrument to the former, and said at 147 Tex. 115, 213 S.W.2d 458–459:

> "Neither in Grissom v. Anderson nor in White v. Greene was the instrument which ratified the prior conveyance a re-execution of the conveyance, nor was it in terms that in themselves would amount to a sufficient present conveyance of what was conveyed, or purported to be conveyed, by the prior instrument. Nevertheless in both cases it was held that the subsequent instruments worked ratification *because they were executed in formal recognition of the validity of the conveyances to which they referred.* [Citations omitted].
>
> "In the instant case, the oil and gas lease executed by Blanchard and wife contains, *in terms of an agreement, a formal recognition of the validity of the two mineral deeds and of the ownership under the deeds* of an undivided one-half interest in the minerals, and, under the authorities cited, it was a full and effective ratification of those deeds."

The court of civil appeals summed up the rule of revivor by subsequent instrument in Hastings v. Pichinson, 370 S.W.2d 1, 4 (Tex.Civ.App.—San Antonio 1963, n.

w. h.): "The subsequent execution of a formal document even to a third person which *expressly recognized in clear language* the validity of the lifeless deed or lease has been held to give it life." The Unit Agreement and Unit Operating Agreement ratified by the Murpheys is no such instrument. There is no direct statement of ratification in words clear or otherwise. Nor is there any inference of validity of the Murphey-Garrett lease or *even of its existence*.

The Defendants rely on Sections 3.1, 3.3, and 3.5 of the Fairway Unit Agreement to ratify the Murphey-Garrett lease and the Atlantic-Milner unit. The sections do not have that effect.

Section 3.1 provides:

"Sec. 3.1 *Oil and Gas Rights Unitized. Subject to the terms and conditions of this agreement,* all the Oil and Gas Rights of the Royalty Owners in and to the lands included within the Unit Area on Exhibit A, whether or not described or identified in Exhibit B, and *all of the Oil and Gas Rights of the Working Interest Owners in and to said lands are hereby unitized* insofar as said respective Oil and Gas Rights pertain to the Unitized Formation, all to the same extent as if the right to search for, develop, operate and produce from the Unitized Formation had been included in a single lease executed by all the Royalty Owners, as lessors, in favor of all the Working Interest Owners, as Lessees, and as if said lease had been subject to all of the terms and conditions of this agreement."

The emphasized portion indicates that the Murpheys did nothing more than unitize the 66.5 acre tract into the Fairway Unit, which they admit.

Defendants argue that Section 3.3 of the agreement amends and ratifies the Murphey-Garrett lease. Section 3.3 provides:

"Sec. 3.3 *Amendment of Leases and Other Agreements.* The terms and provisions of the various leases, agreements, division and transfer orders, or other instruments *covering* the respective Tracts or the production therefrom are hereby amended *only to the extent necessary to make them conform* to the terms and provisions of this agreement, but otherwise are to remain in full force and effect. . . ."

The Murphey-Garrett lease clearly no longer *covered* the tract in question. Even should it be held to have terminated but still "cover" the tract, the lease could not have been amended to show Atlantic as working interest owner and still retain consistency with the Unit Agreement.

■ Defendants argue that Section 3.4 continued the Murphey-Garrett lease. Section 3.4 provides as follows:

"Sec. 3.4 *Continuation of Leases, Term Mineral Interests and Term Royalties.* Unit Operations, as herein defined, conducted with respect to the Unitized Formation on any part of the Unit Area, including drilling operations on or production from any part of the Unitized Formation, *shall,* except for the purpose of determining payments to Royalty Owners, be considered as operations upon or production from each Tract and such Unit Operations or production shall continue in force and effect each lease or term mineral interest or term Royalty Interest just as if such Unit Operations had been conducted and a well had been drilled on and was producing from each such Tract."

A necessary constituent of continuity is existence; Section 3.4 is clearly prospective and inapplicable to terminated leases.

■ Defendants seem to place their major emphasis to support a ratification on two exhibits to the Unit Agreement. One is Exhibit A which Respondent admits "is a map showing the *boundary lines* of the [Fairway] Unit Area and the tracts including Tract 548 the Atlantic-Milner 160 acre unit." To the map is attached a two-

column listing not containing the names of the Murpheys captioned "Working Interest Owners Whose Names Are Abbreviated on Exhibit A and Exhibit B Are Identified As Follows." To build an admission of ratification upon such a listing not even designated a complete list of working interest owners is to disregard the clear definitions contained in the Unit Agreement. Exhibit B is a listing of tracts "comprising the unit area  .  .  . *described or identified as follows:*"

"Tract 548—Atlantic Milner Unit. Being 160,000 acres out of the Jose Mora Survey, A–497, Henderson County, Texas, *as described* in that Designation of Unit dated September 8, 1961, executed by The Atlantic Refining Company et al and recorded in Volume 504, page 576, Deed Records of Henderson County, Texas."

In holding that the ratification did not limit its reference to the Atlantic-Milner unit for description only the court of civil appeals erred. This case is like that presented in Sharp v. Fowler, 151 Tex. 490, 252 S.W.2d 153 (1952), in which the construction to be given a deed describing a tract of land turned on the meaning to be given the clause "being the same land described in a [prior] deed.  .  .  ." The prior deed conveyed only the surface; the grantor in the second deed argued he had conveyed only the surface by incorporation of the first. In holding that the second deed conveyed the grantor's mineral interests as well, this Court said:

"Following the grant there is designated the number of acres granted and the county and survey in which the land is located. That language, standing alone, is insufficient to constitute a legal description of the land. Smith v. Sorelle, 126 Tex. 353, 87 S.W.2d 703; Adams v. Duncan, 147 Tex. 332, 215 S.W.2d 599. But the description is made certain by the language 'being the same land described in' the Frost deed. To describe land is to outline its boundaries so that it may be located on the ground, and not to

define the estate conveyed therein. It is to be observed that the reference in the Jordan deed is not to the land *conveyed* in the Frost deed but to the land *described* in that deed. (Italics ours)."

A different situation is of course raised when reference to a prior conveyance is made "for all purposes." *See*, e. g. Harris v. Windsor, 156 Tex. 324, 294 S.W.2d 798 at 800 (1956).

"The construction of the Windsor-Harris deed is dependent upon the effect to be given to the clause 'reference to which is made for all purposes,' and to the clause in the Federal Land Bank deed, 'reference is hereby made for all legal purposes.' It is the position of petitioner that the Windsor-Harris deed should be construed as if it read 'for all purposes of description.' It is obvious that the reference in the Federal Land Bank deed to the Liverman-Tems deed, 'for all legal purposes,' was not for the purpose of description, but for the purpose of disclosing that the deed was subject to all restrictions and reservations in that deed. As before stated, that deed reserved one-half the minerals to Liverman.

"We are referred to no decision by this court which limits the expression 'for all purposes' to the purpose only of description."

█ The refusal of a writ, no reversible error, in Jones v. Hunt Oil Co., 456 S.W.2d 506 (Tex.Civ.App.—Dallas 1970), does not compel a contrary result in this case. That case concerned the same ratification agreement as the instant, and there is language in the court of civil appeals opinion that ratification in that case was established as a matter of law. Without disapproving that language or its result, we hold the case distinguishable. In Jones v. Hunt Oil Co., supra, the parties seeking to avoid ratification had stipulated throughout the appeal of Jones v. Killingsworth, supra, that should they prevail in establishing termination of the lease they would ratify the

unit. Then after their success in Jones v. Killingsworth the same parties sought to recover damages for the conspiratorial agreement between the unit declarants in creating the unit. To permit a party in a subsequent suit to judicially assert the contrary of facts made the basis of his prior victory would be to perpetrate a fraud on the court and to reopen issues closed by prior decisions. *See* 28 Am.Jur.2d at 60. Thus, the decision in Jones v. Hunt Oil Co., supra, is upheld without inquiry into whether ratification of the fieldwide unit ratified a prior unauthorized unit. Here Plaintiffs specifically embrace the fieldwide unit, denying only the smaller unauthorized unit, and differ with Defendants only as to the capacity in which they ratified.

The court of civil appeals cites the statement in Summers, 5 LAW OF OIL AND GAS, § 970 at 112 (C.1966) and 37 (1973 Supp.), that: "Execution of a unitization agreement by the lessor in a lease has been held a waiver of all past lease defaults, and ratification of the lease in the unit." The rule is not so broad as to cover this case, and the two cited cases so holding are distinguishable from the facts in this case. In neither case cited did the fact situation involve an intermediate and a larger pooling unit where ratification of the latter was argued to ratify the former. The cited case of Beck v. Norbeck Co., 116 Mont. 345, 151 P.2d 1014 (1944), is an estoppel case wherein the party seeking to avoid ratification of a terminated lease continued to accept royalties under the unit. In Kaufman v. Arnaudville Co., Inc., 186 So.2d 337 (La.Ct.App.1966, writ ref'd, 249 La. 575, 187 So.2d 729), the ratification agreement specifically acknowledged that the lease executed by the ratifier and described in the ratification "is fully effective at this time." The ratification agreement executed by the Murpheys contains no such acknowledgment.

■■■ We further disagree with the court of civil appeals that the Murpheys waived their status as working interest owners by failure to declare their interest to another, to repudiate the Murphey-Garrett lease, or to demand the instruments be amended to show their status as working interest owners. Record title is not lost by failure to proclaim it and repudiation of a void lease would be superfluous. Watson v. Rochmill, 137 Tex. 565, 155 S.W.2d 783 (1941). The instruments on file showed the Murpheys to be working interest owners within the meaning of the Unit Agreement and Unit Operating Agreement. Respondents fail to demonstrate that Plaintiffs' predecessors voluntarily adopted the theory necessary for Respondents to prevail, nor was there any assertion by instrument of a position contrary to that which Plaintiffs now claim such that it would be inequitable now to permit Plaintiffs to assert their claims.

The judgment of the court of civil appeals is reversed, and the judgment of the trial court is affirmed.

WALKER, J., concurs in the result.

REAVLEY, J., dissents.

REAVLEY, Justice (dissenting).

When Murphey owned the mineral estate (subject to outstanding royalty) in this tract, he executed a formal "ratification" which confirmed and bound him to the provisions of the unit operating agreement. The unit operating agreement contained a schedule of ownership of the working interest in the tract; that schedule did not list Murphey as an owner of working interest, as it would have done if his mineral estate had not been under lease, but listed Atlantic (and its assignee, Hunt) as the owner of 100% of the working interest. I agree with the Court of Civil Appeals that this case is controlled by Loeffler v. King, 149 Tex. 626, 236 S.W.2d 772 (1951). The original lease was revived or ratified. The judgment in favor of Atlantic et al. should be affirmed.