11th
Court of Appeals

                                                                  Eastland,
Texas

                                                                        Opinion

 

Ernest Cannon

Appellant

Vs.                   No. 11-02-00286-CV B Appeal from Erath County

Sun-Key Oil Co., Inc.

Appellee

 

Ernest
Cannon sought a declaratory judgment terminating an oil and gas lease covering
a 352-acre production unit.  In his
petition, Cannon alleged alternative theories for termination: (1) Atotal cessation of production@ after the primary term and (2) a Acessation of production in paying quantities@ after the primary term.  Sun-Key Oil Co., Inc., the lessee by
assignment, asserted that the lease never terminated.  Alternatively, Sun-Key asserted that Cannon revived the lease
after the alleged termination by recognizing its validity in letters that he
sent to Sun-Key and another entity.

            Cannon=s Atotal cessation of production@ theory was not submitted to the jury. 
Cannon=s Acessation of production in paying quantities@ theory was submitted in Question Nos. 1 and
2.  The jury answered Question Nos. 1
and  2 in Cannon=s favor, but also found that Cannon had
revived the lease in response to Question No. 6.  Based on the jury=s finding of revivor, the trial court entered judgment that Cannon take
nothing on his claim for declaratory judgment. 
The trial court awarded Sun-Key the amount of $10,000 in attorney=s fees. 
In his appeal, Cannon asserts that there was no evidence to support the
jury=s finding of revivor.  In a cross-point, Sun-Key maintains that
there was no evidence to support the jury=s finding in response to Question No. 2 that a reasonably prudent
operator would not have continued to operate the lease as it related to the
Parkey No. 1 Well in the manner in which it was operated for the purpose of making
a profit and not merely for speculation. 
We agree with Cannon that there was no evidence to support the jury=s finding of revivor.  However, we find that there was no evidence
to support the jury=s
finding in response to Question No. 2. 
Therefore, we sustain Sun-Key=s cross-point and affirm the trial court=s judgment.

 








                                                                Background
Facts             

Cannon
owns the surface estate and one-half (2) of the mineral estate of approximately 6,034.79 acres known as the
Parkey Ranch in Erath County.  In 1973,
Cannon=s predecessors-in-title, as lessors, entered
into an oil and gas lease covering 6,518 acres, including the Parkey
Ranch.  The lease created 11 units
within the 6,518 acres and provided that Aeach unit will be independent of the other units as though covered by a
separate lease.@  The
lease had a primary term of five (5) years and a secondary term for Aas long thereafter as oil or gas is produced
therefrom, subject to the conditions as hereinafter provided.@  

In 1978,
the lessee completed the Parkey No. 1 Well on one of the units covered by the
lease.  The Parkey No. 1 Well produced
gas, and the lessee designated the well as the Parkey Ranch Unit No. 1, Well
No. 1 production unit covering 352 acres. 
This 352-acre unit is the subject of this cause.  We will refer to the 1973 lease as it
relates to the subject 352 acres as the Lease. 


In 1994, D
and N Natural Gas Operating Co., Inc. received an assignment of the Lease from
the lessee and began operating the Parkey No. 1 Well.  The Parkey No.1 Well continued to produce gas and make a profit,
but required substantial monthly compressor costs for production.  With the agreement of James R. Parkey, Jr.,
D and N decided to build a new pipeline on the Parkey Ranch, with plans to have
16 wells feed into the pipeline, including the Parkey No.1 Well and three other
wells operated by D and N on the Parkey Ranch. 
One benefit of the planned pipeline was that D and N would no longer have
to incur substantial compressor costs to produce the Parkey No. 1 Well. 

In October
1995, D and N shut down the Parkey No. 1 Well in connection with the decision
to build the pipeline but planned to resume production from the well after
completion of the pipeline. After completing the pipeline in May 1996, D and N
attempted to resume production from the well, but it would not produce.  D and N conducted various operations to
determine the cause of the problem.  In
June 1997, D and N discovered a hole in one of the drill collars on the
well.  D and N replaced the drill
collar, and the well began producing immediately.  D and N connected the well to the new pipeline.  








In August
1997, Cannon purchased his interest in the Parkey Ranch.  In 1998, D and N assigned its undivided
interest in the Lease to Sun-Key. 
Sun-Key began operating the Parkey No. 1 Well.  Thereafter, Cannon filed this action, alleging that the Lease
terminated during D and N=s operation of the well.

                                                                  Issues
Presented 

In three
issues, Cannon asserts that (1) the trial court erred in submitting Sun-Key=s revivor defense to the jury because there
was no evidence to support its submission, (2) the trial court erred in its
submission of the revivor question by failing to submit proper instructions of
the requirements of revivor, and (3) Sun-Key is not entitled to recover
attorney=s fees if this court sustains his revivor
issues because Sun-Key would no longer be the successful party.  In a cross-point, Sun-Key asserts that the
trial court erred in denying its motion for judgment notwithstanding the
verdict because there was no evidence to support the jury=s finding in response to Question No. 2 that
a reasonably prudent operator would not have continued to operate the Lease in
the manner in which it was operated. 
Therefore, Sun-Key contends that the Lease did not terminate.

We sustain
Sun-Key=s cross-point and, therefore, find that the
Lease did not terminate.  We address the
revivor issue, however, because Sun-Key presented the revivor defense as an
alternative ground for finding that the Lease is in effect. 

                                                                        Revivor








Sun-Key
had the burden of proof on its defense that Cannon revived the lease.  Cannon asserts that there was no evidence to
support the submission of the revivor issue to the jury.  To address Cannon=s Alegal sufficiency@ or Ano evidence@ challenge, we must consider only the evidence and inferences that tend
to support the finding, disregarding any evidence or inferences to the
contrary.  Southwest Key Program,
Inc. v. Gil-Perez, 81 S.W.3d 269, 274 (Tex.2002); Garza v. Alviar,
395 S.W.2d 821, 823 (Tex.1965); see Merrell Dow Pharmaceuticals, Inc. v.
Havner, 953 S.W.2d 706, 711 (Tex.1997), cert. den=d, 523 U.S. 1119 (1998).  An
appellate court will sustain a no-evidence issue when: (1) the record discloses
a complete absence of evidence of a vital fact; (2) the court is barred by
rules of law or of evidence from giving weight to the only evidence offered to
prove a vital fact; (3) the only evidence offered to prove a vital fact is no
more than a mere scintilla; or (4) the evidence establishes conclusively the
opposite of a vital fact.  Uniroyal
Goodrich Tire Company v. Martinez, 977 S.W.2d 328, 334 (Tex.1998).  If there is any evidence to support the
finding, we must overrule the no-evidence point.  Juliette Fowler Homes, Inc. v. Welch Associates, Inc., 793
S.W.2d 660, 666 (Tex.1990); In re King=s Estate, 244 S.W.2d 660 (Tex.1951).

 Under the doctrine of revival, a lifeless
lease is revived by the subsequent execution of a formal document which
expressly recognizes in clear language the validity of the lifeless lease. Westbrook
v. Atlantic Richfield Company, 502 S.W.2d 551 (Tex.1973); Exploracion De
La Estrella Soloataria Incorporacion v. Birdwell, 858 S.W.2d 549, 554
(Tex.App. B Eastland 1993, no writ).  The subsequent formal document must make a
sufficient reference to the lease to revive it.  Westbrook v. Atlantic Richfield Company, supra at
555.  Williams and Meyers explain that,
because revivor grants a new estate in land, the estate Ashould not be held to have been granted
without a showing of intent to grant it.@  HOWARD R. WILLIAMS &
CHARLES J. MEYERS, OIL AND GAS LAW ' 340.04 (2002).  

Courts
have held that the subsequent execution of mineral deeds referring to lifeless
oil and gas leases and recognizing their validity revived the leases.  Humble Oil & Refining Co. v. Clark,
87 S.W.2d 471, 473 (Tex.1935)(Deed providing that it covered property held by a
lease and that Athis sale is made subject to the terms of
said lease@ revived the lease that had terminated for
the nonpayment of rentals); Loeffler v. King, 236 S.W.2d 772, 774
(Tex.1951)(Deed providing that the land was Aunder an Oil and Gas lease@ revived the lease that had terminated for lack of production in paying
quantities).  However, in Westbrook,
the court held that the execution of agreements neither referring to a
terminated lease nor containing Aany inference of validity of the [lease] or even of its existence@ did not revive the lease.  Westbrook v. Atlantic Richfield Company,
supra at 556. 

Sun-Key
relied on five documents to support its revivor defense: (1) a letter from
William L. Durham, Cannon=s attorney, to Sun-Key, dated October 23, 1997; (2) a letter from
Cannon to D and N, dated December 5, 1997; (3) a letter from Durham to D and N,
dated December 10, 1997; (4) a letter from Cannon to D and N, dated January 26,
1998; and (5) the Special Warranty Deed executed by Jolene P. Parkey, as
Grantor, to Cannon, as Grantee, dated August 28, 1997. 








 We first address Durham=s October 23, 1997, letter to Sun-Key and his
December 10, 1997, letter to D and N because they were similar.  Durham did not refer to the Lease in the
letters.  He stated that Cannon had
purchased 6,043.79 acres of land from Parkey and enclosed copies of the August
28, 1997, Special Warranty Deed.  He
also stated that the deed conveyed one-half (2) of the oil, gas, and other minerals in and under the property to
Cannon and that Cannon was entitled to receive all royalty, lease bonus, and
delay rental payments pertaining to AGrantee=s Mineral Estate@ accruing since August 28, 1997.  These statements regarding AGrantee=s Mineral Estate@ did not refer to any leases, much less recognize the validity of any
leases.  Durham requested that Sun-Key
and D and N Atake appropriate action as required by law,
applicable mineral leases and other documents pertaining to the property to
protect Mr. Cannon=s
livestock from [their] well sites, pipelines, etc.@ 
However, this request did not recognize that there were, in fact, any
applicable leases.

In his
December 5, 1997, letter, Cannon stated that he had purchased the surface and
mineral estates of the Parkey Ranch.  He
requested that D and N change its records to reflect payment of royalties to
him.  He also stated that D and N=s well locations were causing risks to
livestock, property, and people.  Cannon
requested D and N to take steps to protect against the risks.  The January 26, 1998, letter was a follow-up
to the December 5, 1997, letter.  Cannon
stated that D and N had not taken any steps to correct deficiencies in the
maintenance of its well sites.  He
demanded that D and N begin to correct the deficiencies within five days.  The December 5, 1997, and January 26, 1998,
letters did not refer to any leases or recognize the validity of any
leases.  

The August
28, 1997, Special Warranty Deed provided that the conveyance of the property
was subject to A[a]ll valid and subsisting, outstanding and
duly recorded oil and gas leases, which are vested in parties other than
Grantor as of the date hereof.@  However, the deed did not
identify any valid and subsisting leases, nor did it refer to any specific
leases.  The language of the deed was
insufficient to revive the Lease.  See
Westbrook v. Atlantic Richfield Company, supra at 555-56.           The
letters and deed did not refer to the Lease, much less contain language showing
an intent to grant a new estate in the 352 acres.  They did not contain language to the effect that the property was
subject to the Lease.  They did not
recognize in clear language the validity of the Lease.  They did not revive the Lease.[1]  See Westbrook v. Atlantic Richfield
Company, supra; see also Loeffler v. King, supra; Humble Oil
& Refining Co. v. Clark, supra.








Because
there was no evidence to support the finding of revivor, we need not address
Cannon=s complaint in his second issue that the
trial court failed to submit proper instructions of the requirements of
revivor.  In his third issue, Cannon
asserts that, if his revivor issues are sustained, the trial court=s award of attorney=s fees to Sun-Key should be reversed because
Sun-Key would no longer be the successful party.  Cannon=s
third issue is overruled because, based upon our ruling on the cross-point,
Sun-Key remains the successful party in this action.       

                                 Cessation of Production in Paying
Quantities 

A lessor
seeking to establish that a lease terminated because of a Acessation of production in paying@ quantities must meet a two-prong test: (1)
that the lease failed to yield a profit over a reasonable period of time and
(2) that a reasonably prudent operator would not have continued to operate the
well in the manner in which it was being operated for the purpose of making a
profit and not merely for speculation.  Skelly
Oil Company v. Archer, 356 S.W.2d 774, 783 (Tex.1962); Clifton v. Koontz,
325 S.W.2d 684, 690-91 (Tex.1959). 
Sun-Key asserts in its cross-point that the trial court erred in denying
its motion for judgment notwithstanding the verdict because there was no
evidence to support the jury=s finding with respect to the second prong of the test.

In his
reply brief, Cannon asserts that the two-prong Acessation of production in paying quantities@ analysis does not apply in this case because
there was a
Atotal
cessation of production@ from the Lease.  Case
law recognizes a distinction between a Atotal cessation of production@ and a Acessation of production in paying quantities.@  See
Ridenour v. Herrington, 47 S.W.3d 117, 121-22 (Tex.App. B Waco 2001, pet=n den=d); Bachler v. Rosenthal, 798 S.W.2d
646, 650 (Tex.App. B
Austin 1990, writ den=d); Wainwright
v. Wainwright, 359 S.W.2d 628, 630 (Tex.Civ.App. B Fort Worth 1962, writ ref=d n.r.e.). 
A Atotal cessation of production@ occurs when a well that has been producing
gas ceases to produce any quantity of gas. 
When there has been a Atotal cessation of production,@ the two-prong Acessation of production in paying quantities@ analysis does not apply.  Ridenour v. Herrington, supra at
121-22; Bachler v. Rosenthal, supra at 650; Wainwright v. Wainwright,
supra at 630.    








In his petition, Cannon alleged a “total cessation
of production” as an alternative theory for terminating the Lease.  His claim that the Lease terminated based on
a “total cessation of production” was an independent theory of recovery upon
which he had the burden of proof. 
However, Cannon did not request that a “total cessation of production”
issue be submitted to the jury.  The
only cessation issue submitted to the jury inquired whether the Lease had a “cessation
of production in paying quantities.”  In
his reply brief, Cannon asserts that the evidence conclusively established a “total
cessation of production” and requests we find as a matter of law that there was
a “total cessation of production.” 
Cannon did not request the trial court to make a finding on this
issue.  We find that Cannon waived the “total
cessation of production” issue. 
TEX.R.CIV.P. 279; TEX.R.APP.P. 33.1. 

We review
the denial of Sun-Key=s
motion for judgment notwithstanding the verdict under a legal sufficiency
standard.  Navarette v. Temple
Independent School District, 706 S.W.2d 308, 309 (Tex.1986).  The legal sufficiency standard is set forth
above.  

Cannon had
the burden to prove that a reasonably prudent operator would not have continued
to operate the Lease in the manner in which 
it was operated for the purpose of making a profit and not merely for
speculation during the period of cessation. 
Clifton v. Koontz, supra. 
In Clifton, the supreme court explained the Areasonably prudent operator@ standard:

In the
case of a marginal well, such as we have here, the standard by which paying
quantities is determined is whether or not under all the relevant circumstances
a reasonably prudent operator would, for the purpose of making a profit and not
merely for speculation, continue to operate a well in the manner in which the
well in question was operated.

 

In
determining paying quantities, in accordance with the above standard, the trial
court necessarily must take into consideration all matters which would
influence a reasonable and prudent operator. 
Some of the factors are: The depletion of the reservoir and the price
for which the lessee is able to sell his produce, the relative profitableness
of other wells in the area, the operating and marketing costs of the lease, his
net profit, the lease provisions, a reasonable period of time under the circumstances,
and whether or not the lessee is holding the lease merely for speculative
purposes.     

 








Clifton v. Koontz, supra at 691; see also Anadarko
Petroleum Corporation v. Thompson, 94 S.W.3d 550, 559 (Tex.2002); Bales
v. Delhi-Taylor Oil Corporation, 362 S.W.2d 388, 391 (Tex.Civ.App. B San Antonio 1962, writ ref=d n.r.e.). 
One court has explained that the lessor must prove that a reasonably
prudent operator would not have continued under the circumstances in the
attempts devoted to obtaining such production. 
Ballanfonte v. Kimbell, 373 S.W.2d 119, 121 (Tex.Civ.App. B Fort Worth 1963, writ ref=d n.r.e).

Only two
witnesses, both called by Sun-Key, presented testimony regarding the “reasonably
prudent operator” issue: (1) Joe Delaney of D and N and (2) L. H. Jones of
Sun-Key.   Cannon had designated an
expert witness to testify on oil and gas issues, but the trial court excluded
the testimony based on Sun-Key’s objection that the designation was
untimely.  Cannon asserts that the
cross-examination testimony of Delaney and Jones provided evidence to support
the jury’s finding.

On direct examination, Delaney testified
about the history of the Parkey No. 1 Well and D and N’s operation of the
well.  D and N acquired and began
operating the Parkey No. 1 Well and three other wells on the Parkey Ranch in
1994.  The Parkey No. 1 Well had been
profitable for years. D and N continued to produce it for a profit, but D and N
had to incur high compressor costs to produce it.  

Delaney developed a plan to construct an
above surface pipeline on the Parkey Ranch. 
He planned to have 16 wells feed into the pipeline, including the Parkey
No. 1 Well and the other three D and N wells. 
Delaney testified that the new pipeline would allow D and N to produce
its wells in a more efficient manner. 
Delaney stated that D and N would no longer have to incur high
compressor costs to produce the Parkey No. 1 Well.  Delaney testified that James Parkey orally agreed that D and N
could lay the pipeline.  








Delaney further testified that D and N shut
down the Parkey No. 1 Well in October 1995 as part of the plan to build the
pipeline.  D and N completed the
pipeline in May 1996.  D and N attempted
to resume production from the Parkey No. 1 Well at that time, but the well
would not produce.  Delaney testified
that D and N conducted various activities on the well in an effort to determine
the cause of the problem with the well. 
For example, D and N had
the well swabbed in May 1996 and several times during the summer of 1996.  D and N also put a pump jack on the well. In
the fall of 1996, D and N had a contractor clean the road so that equipment
could be brought in to work on the well in the spring of 1997.  As the summer of 1997 approached, D and N
pulled the pipe from the well two or three times, replaced the downhole pump on
the well, and worked on the pump jack. 
In June 1997, D and N pulled all the pipe from the well, pressured the
pipe up one piece at a time, and discovered that the second to the last drill
collar had a hole in it.  Within 24
hours of the discovery, D and N replaced the collar, and the well began
producing immediately. 

D and N
connected the Parkey No. 1 Well and its other wells to the pipeline.  Thereafter, Cannon purchased the Parkey
Ranch.  Delaney testified that Cannon
requested him to pick up D and N’s pipeline. 
Delaney stated that he believed he had to pick up the pipeline because
he and James Parkey had not entered into a written agreement regarding the
pipeline.  Delaney testified that D and
N could not produce its wells economically without the pipeline.  D and N sold its interest in the Parkey No.
1 Well to Sun-Key.  Delaney stated that
Sun-Key routed the production from the Parkey No. 1 Well to another
pipeline.  D and N plugged its other
wells, picked up its pipeline from the Parkey Ranch, and went out of business. 

In Delaney=s
opinion, he diligently tried to restore production from the Parkey No. 1 Well
during the period it was not producing. 
Delaney testified that he determined the cause of the problem through a
series of experiments on the well.  In
his opinion, a prudent operator would have continued to operate the well with
an expectation of profit and not merely for speculation.  Delaney stated that he was operating the
well for the purpose of making a profit. 
Delaney thought that the well would produce for another 10 or 15 years. 

On
cross-examination, Delaney testified that he shut down the Parkey No. 1 Well in
October 1995 by turning off the compressor. 
Delaney stated that the well did not produce from October 1995 through
June 1997.  Delaney did not plan to have
the well down for 20 months.  Delaney
testified that D and N sacrificed the production from the well as part of the
plan to construct the pipeline.  He
stated that D and N could have completed the pipeline before shutting down the
well.  He also stated that an operator
can cause damage to a well by shutting it down improperly.  

On direct
examination, Jones testified that, in his opinion, D and N diligently tried to
restore production from the Parkey No. 1 Well in a reasonable manner as a
reasonable operator would have attempted to do.  Jones stated that D and N did not take an inordinate amount of
time to restore production.  Jones also
stated that, when the well was down, Delaney worked on the well and tried to
figure out what was causing the problem. 
In Jones=s opinion, a prudent operator would have
continued to operate the well expecting a profit and not merely for the purpose
of speculation.     








On
cross-examination, Jones testified that D and N did not have to shut down the
well before constructing the pipeline. 
Jones stated that D and N completed the pipeline in May 1996. 

Cannon asserts that the cross-examination
testimony of Delaney and Jones established that D and N operated the Parkey No.
1 Well in an unreasonable manner. 
Therefore, Cannon argues that there was evidence to support the jury=s finding that a reasonably
prudent operator would not have continued to operate the well in the manner in
which D and N operated it.  To support
his argument, Cannon relies on the length of time that the well was down B 20 months B and the cross-examination
testimony of Delaney and Jones (1) that D and N did not have to shut down the
well before building the pipeline, (2) that an operator can cause damage to a
well by shutting it down improperly, and (3) that Delaney did not plan for the
well to be down for 20 months.

            Cannon
places special emphasis on Delaney=s testimony in which he said, AI think a reasonable and prudent operator would probably approach it
different the second time.@  However, the record shows that
Delaney was referring to the fact that he did not have a written agreement with
James Parkey regarding the pipeline. 
Given another opportunity, Delaney stated that he would want to have a
written agreement regarding the pipeline.     


Cannon did
not present any evidence that a reasonably prudent operator  would have operated the well in a different
manner, would have restored production sooner, or would not have continued
under the circumstances in the attempts devoted to obtaining such
production.  Considering the factors
listed by the court in Clifton, we find that there was no evidence to
support the jury=s finding. Sun-Key=s cross-point is sustained.

This
Court=s Ruling

The
judgment of the trial court is affirmed. 

                           

W. G. ARNOT, III

CHIEF
JUSTICE

 

August 29, 2003

Panel consists of: Arnot, C.J., and

Wright, J., and McCall, J.











     [1]Because
the language in the letters was insufficient to revive the lease, it is not
necessary to determine whether the letters constituted Aformal documents@
with respect to the revivor issue.